Emily Harris Gant (WSBA No. 35679)
Admitted *Pro Hac Vice*
Ogden Murphy Wallace, PLLC
901 5th Avenue, Suite 3500
Seattle, WA 98164
Telephone:  206.447.7204
Fax:  206.447.0215
egant@omwlaw.com

Brian T. Hafter (CA Bar No. 173151)
LeClairRyan
44 Montgomery Street, 18th Floor
San Francisco, CA  94104
Telephone:  415.913.4927
Fax:  415.391.8766
brian.hafter@leclairryan.com

Attorneys for Defendant
Clarion Medical Technologies, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SCITON, INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>CLARION MEDICAL TECHNOLOGIES,<br>INC., AND DOES 1-100, inclusive,<br><br>                    Defendant. | C13-1334 HRL ADR<br><br>DEFENDANT CLARION MEDICAL<br>TECHNOLOGIES, INC.'S ANSWER,<br>AFFIRMATIVE DEFENSES, AND<br>COUNTERCLAIM |

## ANSWER

1.    Upon information and belief, admit.

2.    Admit.

3.    Admit the first, second, and third sentences of this paragraph.  As to the fourth sentence, admit that the Agreement identified Coherent-AMT Inc. ("Coherent-AMT") as the Official Sales Representative for selling and distributing Sciton's products in Canada.  Assuming

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
1

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

that Sciton defines the term "exclusive dealings contract" to mean that Clarion was the sole entity permitted to sell and service Sciton lasers in Canada, with exceptions noted in the Agreement, admit. Admit that Coherent-AMT changed its name to Clarion Medical Technologies, Inc. ("Clarion"), and continued performance under the Agreement. Deny all remaining allegations in this paragraph.

4. Admit that this Court has personal jurisdiction. Deny that the Agreement uses the phrase "mandatory forum selection clause." As to the third sentence and footnote 1 in this paragraph, the Agreement speaks for itself. To the extent an answer is required to the third sentence and footnote 1, admit that they accurately quote portions of the Agreement. Admit that Clarion had an ongoing business relationship with Sciton dating back to 2004, the Agreement called for title and ownership of products to pass to Clarion in California, and Clarion coordinated and paid for air transport, freight consolidation, and import from the United States into Canada. Deny that Clarion sold Sciton devices in the United States during the pendency of the Agreement. Sciton does not define its use of the phrase "via its used laser dealer relationships," and therefore this allegation is denied for lack of information. Admit that Daniel Webb has a partial ownership interest in Clarion. Admit that Mr. Webb has a partial ownership interest in AMT Finance, Inc. Deny all remaining allegations in this paragraph.

5. Deny that the Agreement uses the phrase "mandatory forum selection clause." Admit remaining allegations in this paragraph.

6. Deny that Sciton's citizenship is limited to California. Admit the remaining allegations in this paragraph.

7. Upon information and belief, admit.

**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)

2

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

8. This paragraph contains no allegations to which an answer is required. To the extent an answer is required, deny that the remaining paragraphs support Sciton's claims.

9. Admit the first sentence of this paragraph. The remaining sentences in this paragraph contain no allegations to which an answer is required. To the extent an answer is required, deny that Sciton asserts valid claims and deny that Sciton is entitled to the relief sought.

10. Admit.

11. Admit.

12. Upon information and belief, admit.

13. Admit the first sentence of this paragraph. As to the second sentence, the Agreement speaks for itself. To the extent an answer is required, deny that this paragraph accurately quotes those portions in the Agreement.

14. Admit.

15. Deny that the termination was effective on May 10, 2012. Admit the remaining allegations in this paragraph.

16. The Agreement speaks for itself. To the extent an answer is required, admit that this paragraph accurately quotes those portions of the Agreement.

17. Admit that the parties attempted to wind down the Agreement without Court intervention, but did not reach resolution. Deny the remaining allegations in this paragraph.

18. Deny that the accounts payable balance is delinquent. Admit that the Agreement contemplated Clarion's purchase of large volumes Sciton's products. As for the remaining allegations, the Agreement speaks for itself. To the extent an answer is required, admit that this paragraph accurately quotes portions of the Agreement, but for two (2) typographical errors.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)

3

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

19.    Deny.

20.    Deny.

21.    Deny.

22.    Deny that Sciton defines its use of the term "material non-conformities." Assuming that this paragraph refers to Clarion's right to reject any Sciton "Product that fails in any material way to meet the specifications set forth in Sciton's current brochure for that Product" within thirty (30) days of Clarion's receipt, the Agreement speaks for itself. (*See* Ex. 1, p. 7.) To the extent an answer is required, admit that this paragraph accurately quotes portions of the Agreement.

23.    Admit the first sentence of this paragraph. As for the remaining allegations, the Agreement speaks for itself. To the extent an answer is required, admit that this paragraph accurately quotes portions of the Agreement.

24.    Admit the first sentence of this paragraph. As for the remaining allegations, the Agreement speaks for itself. To the extent an answer is required, deny that this paragraph accurately quotes the relevant portions of the Agreement.

25.    Deny. Affirmatively allege that Clarion acted in conformity with the Parties' agreement and/or course of dealing and/or performance.

26.    Deny. Affirmatively allege that Clarion acted in conformity with the Parties' agreement and/or course of dealing and/or performance.

27.    Admit. Affirmatively allege that Clarion acted in conformity with the Parties' agreement and/or course of dealing and/or performance.

28.    Admit that Clarion holds capital equipment and service parts manufactured by

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
4

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

Sciton. Deny that the capital equipment and service parts are Sciton's property. Deny that Clarion holds the capital equipment and service parts in violation of the Agreement.

29. Deny.

30. Deny.

31. This paragraph does not indicate whether Sciton calculated "fair market value" at wholesale, retail, or otherwise, and thus is denied for lack of information. Deny that Sciton is entitled to the compensation sought.

32. This paragraph is silent as to timeframe. Assuming that this paragraph refers to the percentage of Clarion customers with Sciton devices under a Clarion service contract at the time of the Agreement's termination, admit.

33. The Agreement speaks for itself. To the extent an answer to the first sentence is required, admit that this paragraph accurately quotes portions of the Agreement. Deny that the winding up process began in May 2012. Upon information and belief, admit that Sciton began servicing Canadian customers' devices on or about May 10, 2012.

34. Admit.

35. Deny.

36. Admit.

37. Admit that Clarion refused to assign the Clarion Service Contracts without compensation therefore. Deny that Clarion has an obligation to assign the Clarion Service Contracts under the Agreement. As for the remaining allegations, the Agreement speaks for itself. To the extent an answer is required, admit that this paragraph accurately quotes portions of the Agreement.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)
5

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

38.    Admit that Clarion noted its contractual right to terminate the Clarion Service Contracts. Deny the remaining allegations in this paragraph.

39.    Deny.

40.    This paragraph contains no allegations to which an answer is required. To the extent an answer is required, deny.

41.    Admit.

42.    Deny.

43.    Deny.

44.    Deny.

[Unnumbered]  This paragraph contains no allegations to which an answer is required. To the extent an answer is required, deny.

45.    This paragraph contains no allegations to which an answer is required. To the extent an answer is required, deny.

46.    Deny.

47.    Deny.

48.    Deny.

49.    Admit that Clarion received some funds for Service Contracts. Deny that Sciton is entitled to these funds. Affirmatively allege that Sciton has wrongfully assumed the rights and benefits of the Clarion Service Contracts without any consideration to Clarion therefore.

50.    Deny.

51.    Deny.

52.    Deny.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)

6

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

[Unnumbered]  This paragraph contains no allegations to which an answer is required. To the extent an answer is required, deny.

53.    This paragraph contains no allegations to which an answer is required.  To the extent an answer is required, deny.

54.    Admit.

55.    Clarion lacks information to admit or deny whether the present termination of the Service Contracts "will be a detriment to Sciton's business in Canada," and thus denies the same, leaving Sciton to its proof.  Admit that Clarion contends that it has no contractual duty to assign the Clarion Service Contracts to Sciton.  Admit that Clarion contends that it is entitled to compensation for any such assignment.  Admit that the Service Contracts are terminable.  Deny the remaining allegations in this paragraph.

56.    This paragraph contains no allegations to which an answer is required.  To the extent an answer is required, admit that this paragraph sets forth Sciton's contentions.

57.    Admit.

58.    Admit that Sciton seeks judicial determinations on the allegations in this paragraph.  Deny that Sciton is entitled to the relief sought.

[Unnumbered, including subparts (a) and (b)]  This paragraph contains no allegations to which an answer is required.  To the extent an answer is required, deny.

59.    This paragraph contains no allegations to which an answer is required.  To the extent an answer is required, deny.

60.    Admit.

61.    Admit. Affirmatively allege that Sciton is not entitled to said funds.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)

7

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

62.    Admit.

63.    Deny.

64.    Deny.

65.    Deny.

66.    This paragraph contains no allegations to which an answer is required.  To the extent an answer is required, admit that Sciton demanded a jury trial.

## AFFIRMATIVE DEFENSES

1.    Failure to State a Claim.  The Complaint fails to state a claim for relief.

2.    Statute of Limitations.  Some or all of Sciton's claims are barred by the relevant statute of limitations.

3.    Waiver.  Some or all of Sciton's claims are barred by waiver.  Sciton waived any ability to seek "additional fees" for Clarion's alleged failure to return defective capital equipment and/or service parts.  Further, Sciton waived the right to collect interest and/or service charges, where such sums were never billed, collected, or paid prior to this dispute.

4.    Failure of Consideration.  Where Sciton's RMA Orders promised a $0 credit in exchange for the return of defective capital equipment and/or service parts, any purported term failed for lack of consideration.

5.    Payment.  Although the sums owed Clarion are in excess of the Accounts Receivable, Clarion has paid the Accounts Receivable in full, plus interest.

6.    Tender of Defective Service Parts and/or Capital Equipment.  Clarion agreed to ship all defective service parts and/or capital equipment in its possession to Sciton under a litigation hold, pending the outcome of this litigation.  Sciton has frustrated Clarion's efforts to

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)

8

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

perform under the Parties' contract(s) and/or course of dealing and/or performance.

7.    Double Recovery.  To the extent Sciton seeks both the return of capital equipment and service parts and monetary compensation, it wrongfully seeks a double recovery.

8.    Offsets.  Clarion is entitled to offsets to sums allegedly owed.

9.    Incorporation of Counterclaims.  Clarion hereby incorporates its Counterclaims as though set forth fully herein.

## COUNTERCLAIM

### PARTIES

1.    Clarion is a Canadian corporation, with its principal place of business located at 125 Fleming Drive, Cambridge, Ontario, Canada N1T 2B8.

2.    Upon information and belief, Sciton is a Delaware corporation, with its principal place of business at 925 Commercial Street, Palo Alto, California 94303.

### CONTRACTS

3.    On or about February 20, 2004, Coherent-AMT Inc. ("Coherent-AMT") and Sciton entered into an International Representative Agreement (the "Agreement").  (Ex. 1.)  On or about May 1, 2008, Coherent-AMT changed its name to Clarion Medical Technologies, Inc. Clarion thereafter continued performance of the Agreement under its current name. This Counterclaim refers to Clarion (formerly known as Coherent-AMT) and Sciton as the "Parties," unless otherwise noted.

4.    The Parties entered into a binding modification of the Agreement on or about November 7, 2006.

5.    The Parties entered into further binding modifications of the Agreement through

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)
9

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

Clarion's issuance of Purchase Orders and Sciton's issuance of RMA Orders.

## JURISDICTION

6.    The Agreement provides, in relevant part: "The federal and state courts within the State of California, U.S.A., shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement." (Ex. 1, p. 13; *see also id.* at Ex. E, ¶ 16 (applicable law).)

7.    This Court has personal jurisdiction over this dispute, where, *inter alia*:  (a) Sciton has its principal place of business in the State of California; (b) Sciton regularly transacts business in the State; and (c) the Parties transacted business in the State.

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332, where (a) Clarion is a Canadian corporation with its principal place of business in Cambridge, Ontario and Sciton is a Delaware corporation with its principal place of business in Palo Alto, California; and (b) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Further, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, where the Counterclaim is so related to the claims asserted in the Complaint that the Counterclaim forms part of the same case or controversy.

## VENUE

9.    The United States District Court for the Northern District of California is the appropriate venue for this action because it is the judicial district in which Sciton resides.

## INTRADISTRICT ASSIGNMENT

10.    The San Jose Division is the appropriate intradistrict assignment because a substantial part of the events or omissions which give rise to Clarion's claims occurred in Santa Clara County, California, and because the Complaint has been assigned for adjudication to this

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
10

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

Division.

## NATURE OF THE ACTION

11.    This is a complex action arising out of termination of the Agreement.

## FACTS

### A.    Background information

12.    Clarion is Canada's leading supplier of specialty medical technologies, including ophthalmic, urologic, gynecologic, and dermatological medical devices.

13.    Sciton designs and manufactures various dermatological lasers and light-based medical devices.

14.    The Parties entered into the Agreement on or about February 20, 2004.   The Agreement identified Coherent-AMT as the Official Sales Representatives for Sciton products within Canada, subject to limited exceptions not relevant to this dispute.

15.    The Parties generally enjoyed a successful relationship over the pendency of the Agreement.

16.    At times, however, Sciton's products suffered from quality control problems. Sciton recognized the existence of such problems in a letter dated November 7, 2006 (the "Addendum").   There, Sciton's President, Dr. Daniel Negus, acknowledged that Clarion (then Coherent-AMT) had "experienced a number of service, repair and reliability related issues that have challenged your [Coherent-AMT's] confidence and the confidence of some of your customers in our [Sciton's] products. . . . Clearly we have work to do together to restore your faith and that of some of your customers."   The Addendum amended some terms of the Agreement.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
11

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

17.    Sciton's quality control problems continued sporadically after execution of the Addendum.

### B.    The "Return Material Authorization" Process

18.    During the pendency of the Agreement, the Parties used the Return Material Authorization ("RMA") process for Clarion's acquisition of capital equipment and service parts, whether for a customer's initial purchase, inventory, warranty replacements, or non-warranty replacements.  Similarly, the Parties used the RMA process for the return of capital equipment and service parts that failed over time.

19.    While the Agreement contains Terms and Conditions, it does not use the term "Return Material Authorization" or specifically address the RMA process.  Instead, the Parties transacted the RMA process through Sciton's Price Lists, Sciton's "Quoters," Clarion's Purchase Orders, and Sciton's RMA Orders.  These documents are referenced collectively as the "RMA Documents," unless noted.  Clarion's Purchase Orders and Sciton's RMA Orders are referenced collectively as the "RMA Contracts," unless noted.

20.    The RMA process was not governed by the "Rejection of Products" clause in the Agreement.  The "Rejection of Products" clause addressed capital equipment and/or service parts that failed to meet the specifications set forth in Sciton's brochures within thirty (30) days of Clarion's receipt of the respective products.  (Ex. 1, p. 7.)

### i.    Acquisition of Capital Equipment and Service Parts

21.    Capital Equipment.  Sciton issued "Quoters" for Clarion's acquisition of capital equipment, like medical devices, upgrades, hand pieces, and modules.  The Quoters detailed the price for each item of capital equipment.  Maintained as Excel files, these Quoters contained

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
12

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

"drop-down" menus, wherein Clarion could input the types of devices and options involved. The Quoters would then auto-populate with prices as Clarion selected the relevant device and options. Sciton issued new Quoters over time to reflect changes to pricing or available products.

22.    When acquiring capital equipment, Clarion used the Quoters to determine the relevant pricing scheme. This is consistent with the Agreement, which references Sciton's Quoters in Exhibit B. As a general practice, Clarion forwarded the populated Quoter and a Purchase Order for the capital equipment to Sciton, which responded with an RMA Order.

23.    Service Parts. Sciton issued price lists for service parts ("Price List"). The Price Lists detailed the price for each type of service part. Like the Quoters, Sciton issued new Price Lists over time to reflect changes to pricing or available parts.

24.    When acquiring service parts, Clarion used the Price Lists to determine the relevant pricing scheme. This is consistent with the Agreement, which references Price Lists in Exhibit B. As a general practice, Clarion forwarded a Purchase Order for the service parts to Sciton, which responded with an RMA Order.

25.    Sciton opened an RMA for each line of parts ordered.

26.    Throughout the pendency of the Agreement, Sciton's Quoters and Price Lists identified Clarion's price at a wholesale rate. Prior to February 9, 2012, Sciton did not (a) bill Clarion prices higher those identified in the relevant Quoters and/or Price Lists; (b) bill Clarion at retail rates; (c) invoice or otherwise bill Clarion for interest and/or service charges; and/or (d) charge Clarion any "additional fees" if Clarion did not return defective capital equipment and/or service parts that failed over time.

//

EHG1081383.DOC;1\12568.00000\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)

13

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

### ii.    Return of Capital Equipment and Service Parts

27.    The Parties also used the RMA process to address the return of capital equipment and service parts that failed over time, whether or not the materials were under warranty.

28.    Under the Agreement, Clarion was the sole entity authorized to service Sciton devices in Canada.  If a customer required capital equipment or service parts, Clarion either utilized materials from its inventory or ordered the materials from Sciton.  Clarion then installed the new materials into the customer's device, often leaving with the defective materials.

29.    Nothing in the Agreement requires Clarion's return of defective capital equipment and/or service parts.  The Parties often worked cooperatively to facilitate the return of defective materials, however.

30.    If Sciton sought an item's return, it noted the item number in the "Receipts" section of the RMA Order.  (*See e.g.* Ex. 2.)  If Sciton did not seek an item's return, it did not identify the part in the "Receipts" section of the RMA Order.

31.    Sometimes, Sciton encouraged the return of defective materials by requiring an upfront deposit, promising a refund of the deposit upon the defective item's return.  (*See e.g.* Ex. 2.)

32.    Before approximately 2009, it was Clarion's general practice to return all defective materials to Sciton.  In approximately 2009, Sciton informed Clarion that Clarion need only return those items identified in the "Receipts" section of the relevant RMA Order.  From that point forward, it was Clarion's general practice to return those items identified in the "Receipts" section of the relevant RMA Order.

33.    Some of Sciton's RMA Orders noted that it reserved the right to charge

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

"additional fees" if Clarion did not take certain actions, including, but not limited to, returning defective items and/or marking the return box with an RMA number. The Parties neither discussed nor came to agreement on the meaning of the phrase "additional fees." In fact, Sciton never charged any "additional fee" arising out of the RMA process before this dispute arose.

### iii.    Sciton's Practice of Opening Multiple RMAs for a Single Part

34.    Clarion places an emphasis on customer satisfaction, and endeavors to remedy service issues in a timely manner. Upon a customer complaint about a Sciton device, Clarion's staff communicated with the customer via telephone, email, or other means to identify the likely service issue. Based on the employee's training and experience, he or she anticipated which service parts may be necessary to remedy the problem. Sometimes, Clarion's analysis was based on its knowledge of quality control problems experienced by certain Sciton service parts.

35.    If Clarion did not have the spare parts in its inventory, it issued a Purchase Order for the relevant service parts. This increased the likelihood that the technician could remedy the problem in one service visit, thus limiting time in which the customer's device was not performing to specification, and is consistent with common industry standard. Sciton responded with an RMA Order, opening an RMA for each line of parts.

36.    At times, when Clarion physically inspected the customer's device, the service technician determined that he or she did not need all of the parts ordered. Sciton refused to accept return of the new, unused parts. Instead, Sciton instructed Clarion to place the new, unused parts into Clarion's inventory and/or into another customer's device. Clarion complied with these instructions, such that the new, unused parts ultimately went into a different customer's device. Once the service part failed, it was Clarion's general practice to return the

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
15

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

part.

37.    It was Sciton's pattern and practice to open multiple RMAs in these circumstances, with full knowledge that Clarion had a single part to return. Specifically, it opened an RMA for the service part shipped, referencing the first device's Serial Number (*i.e.* S/N 123). When Clarion returned the defective service part after its use in a different device, Sciton opened and closed an RMA, referencing the second device's Serial Number (*i.e.* S/N 456). Sciton did not, however, close the original RMA (S/N 123). So, although Clarion purchased, paid for, and returned a single part, Sciton opened two RMAs for the same part, fully aware that Clarion did not have a second part to return.

### iv.    Sciton's Inaccurate, Inconsistent Record-Keeping Practices

38.    Sciton had significant problems with its record-keeping systems. Particularly relevant to this dispute, Sciton did not accurately track the RMA process.

39.    There were multiple causes for these inaccuracies. First, during some or all of the Parties' contractual relationship, Sciton maintained multiple sets of books. Some employees tracked materials through Excel spreadsheets. Others tracked materials through MFG Pro, or like software. In addition to maintaining multiple sets of books, Sciton's employees utilized different methods to account for the RMA process. These inconsistent and/or inaccurate accounting methods included, but were not limited to, the following:  a) some Sciton employees traced service parts by Serial Number, while others did not; b) sometimes Sciton opened multiple RMAs, even if Clarion only ordered one (1) part; c) sometimes Sciton opened an RMA upon the return of a part, rather than upon the shipment of a part; and d) sometimes Sciton failed to close RMAs, even after Clarion returned defective parts.

EHG1081383.DOC;1\12568.00000\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)
16

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

40.    Sciton knows or reasonably should know that it maintained multiple sets of books, and that its employees did not use consistent methods to track the shipment and return of capital equipment and service parts.

41.    Due to Sciton's record-keeping problems, there are substantial discrepancies between Sciton's records and Clarion's records. Since approximately 2009, representatives from Clarion and Sciton have held lengthy conference calls to reconcile these discrepancies.

**C.    Sciton Terminated the Agreement for Convenience**

42.    Sciton terminated the Agreement for convenience, effective on or about May 9, 2012, stating that it wished to provide direct sales and service in Canada.

43.    The Parties attempted to wind-up the Agreement without Court intervention.

44.    Clarion notified its customers of Sciton's decision, stating that Sciton would provide complete sales and service support for all Sciton products in Canada, effective on or about May 9, 2012.

45.    There were a number of issues upon which the Parties did not reach agreement, including, but not limited to, the following: (a) the RMA reconciliation; (b) ownership of the new, used, and off-leased materials; (c) Sciton's implicit assumption of Clarion's Service Contracts without compensation to Clarion; (d) Sciton's attempts to "undo" Clarion's sales of used devices; (e) the valuation of the warranty labor for warranties arising before termination of the Agreement; and (f) Clarion's ability to service and sell Sciton materials after May 9, 2012.

**i.    RMA Reconciliation**

46.    The Parties attempted to reconcile the RMA analysis. Sciton forwarded a spreadsheet with approximately 200 line items, each purporting to reflect an open RMA

EHG1081383.DOC;1\12568.00000I\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
17

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

("Sciton's RMA Spreadsheet").

47.    As to the items identified in Sciton's RMA Spreadsheet, Clarion previously paid for these items, using the prices identified in the RMA Documents. Inexplicably, Sciton's RMA Spreadsheet demands the retail price for each item, in addition to the agreed-upon price previously paid.

48.    Further, Sciton's RMA Spreadsheet contained significant inaccuracies. Among other things, it contained line items for materials previously returned and reflected Sciton's practice of opening multiple RMAs for a single part. Clarion brought these inaccuracies to Sciton's attention, to no avail.

### ii.    New, Used, Defective, and Off-Lease Materials to Which Clarion Holds Title

49.    Clarion holds title to the Sciton capital equipment and service parts in its possession, whether new, used, or defective. It segregated most, if not all, of the capital equipment and service parts while the Parties attempted to wind-up the Agreement.

50.    Notwithstanding these facts, Clarion started the process of returning defective service parts in its possession, consistent with the Parties' course of dealing and/or performance. On or about April 22, 2012, Clarion returned numerous BBL filters. According to the relevant RMA Orders, Sciton promised to refund Clarion $113,000 in core filter charges upon return of the filters. Although Sciton acknowledged receipt of the filters, it refused to issue any core filter refund. This constitutes a breach of contract.

51.    After Sciton's breach, Clarion was wary of returning additional defective parts until Sciton agreed to meet its contractual obligations.

52.    Both prior to and after Sciton's initiation of this lawsuit, Clarion offered to return

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
18

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

the defective parts, provided that Sciton closed the corresponding RMAs and issued the appropriate credits.

53.     Sciton refused to accept items unless they traced to the original device's Serial Number.  There is no basis for this demand under the Agreement, RMA Contracts, the Parties' course of dealing and/or performance, or usage in trade.

54.     On June 11, 2013, Sciton offered to store the disputed parts in its warehouse, thus "preserv[ing] the items for the course of the litigation hold and the pendency of the case." Clarion accepted this proposal on June 26, 2013.  Based on conversations with counsel, however, it is Clarion's understanding that Sciton is now unwilling to maintain the parts under a litigation hold.  Clarion stands ready, willing, and able to ship the defective parts.

55.     At present, Clarion has possession and title to new and used Sciton materials. Additionally, Clarion is aware of approximately 110 devices that have or will come off of customer leases between approximately May 2012 and May 2016.  Under an agreement with a capital leasing company, Clarion has or will acquire title to some or all of the off-lease devices. The new, used, and off-lease materials are not defective.  Clarion has no obligation to return the new, used, or off-lease materials, whether under the Agreement, RMA Contracts, or otherwise. Clarion offered to sell the new, used, and off-lease materials to Sciton.  Sciton refused.

56.     Generally speaking, the new, used, and off-lease materials are depreciating assets. Clarion has received offers to purchase the new, used, and off-lease materials.

### iii.     Clarion's Service Contracts

57.     Clarion offered Warranty and Service Agreements (the "Clarion Service Contracts") to its customers, both pursuant to the Agreement and its standard business practice.

EHG1081383.DOC;1\12568.00000\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
19

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

58.     The Clarion Service Contracts stated that Clarion or its authorized agent would provide maintenance and repair of the relevant device.

59.     Nothing in the Agreement or otherwise required Clarion's termination of the Service Contracts after May 9, 2012.  Nothing in the Agreement or otherwise required Clarion to assign its rights under the Service Contracts to Sciton after May 9, 2012.

60.     As part of the wind-up process, Clarion and Sciton discussed performance of the Clarion Service Contracts after May 9, 2012. The Parties held a conference on or about February 22, 2012.  Sciton forwarded a "Meeting Summary" the following day.  The Meeting Summary provided, in relevant part:

4.     Service Contract Details

    a.     Clarion will send <u>specifics and pricing details</u> of each of the different service levels (Gold, Silver, Bronze).  This will be forwarded to Sciton on Thursday February 23[.]

    b.     <u>Clarion will send list outlining which customers are currently part of which level and whether they are paying monthly, quarterly or annually.  This will be forwarded to Sciton on Thursday February 23rd[.]</u>

. . . .

5.     Service going forward

. . . .

    b.     Customers currently on service contracts with Clarion

        i.     <u>Clarion will continue to support systems on existing service contracts until **May 9, 2013**</u>.

            1.     Service on systems that expire prior to May 9, 2012 will transfer to Sciton on date of contract expiration[.]

            2.     Service contracts with dates that extend beyond May 9, 2013 will transfer as of May 9th 2013 with compensation for the transfer to be negotiated.

EHG1081383.DOC;1\12568.00000l\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
20

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

(Ex. 3 (emphasis added).)   In reliance upon this agreement, Clarion forwarded Sciton its confidential list of those customers under Clarion Service Contracts.

61.    On or about March 10, 2012, after learning that Clarion had more than sixty (60) percent of the installed base under Service Contracts (as of February 2012), Sciton refused to honor the Parties' February 22, 2012 agreement.  Instead, on or about March 22, 2012, Sciton asked Clarion to assign responsibility for the existing Clarion Service Contracts.  Clarion stated its willingness to assign the Service Contracts in exchange for reasonable compensation.

62.    Sciton refused to compensate Clarion for the Service Contracts.  Instead, using the confidential list provided by Clarion, Sciton has been performing under the Service Contracts.  Further, Sciton is receiving the revenue stream from said Service Contracts.  Sciton has not compensated Clarion for its implicit assumption of the Clarion Service Contracts.

### iv.    Sciton's Attempts to "Undo" Sales

63.    Nothing in the Agreement precluded Clarion's sale of used devices.

64.    Clarion sold used Sciton products throughout the pendency of the Agreement.  Prior to February 9, 2012, Sciton was fully aware that Clarion sold used Sciton products, and that Clarion often included warranties for these used devices.  In fact, Sciton regularly sold Clarion service parts and capital equipment for these used devices.

65.    After Sciton provided notice of its intent to terminate on or about February 9, 2012, Clarion provided a complete list of its install base pursuant to the Agreement.

66.    Consistent with prior practices, Clarion sold used Sciton devices during the wind-up period (February 9, 2012 - May 9, 2012).  One such sale was to a customer named "External Affairs," which purchased a Profile SR from Clarion for $43,000.

EHG1081383.DOC;1\12568.00000\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
21

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

67.     Using the confidential customer install list, Sciton endeavored to "undo" Clarion's sales of used devices.  Sciton approached customers, making disparaging statements about Clarion.  It withdrew warranty support of used devices, contrary to the prior course of dealing and/or performance.  It offered new devices for the price of the used systems sold by Clarion.

68.     In a frank email dated June 9, 2012, Sciton's President Dan Negus admitted that Sciton "decided to undo as many [of these sales] as we could."

69.     As the result of Sciton's actions, External Affairs canceled its contract with Clarion.

### v.     Sciton Refused to Provide Documentation for the Cost of Warranty Service

70.     The Agreement states that Clarion will provide the "[l]abor for all warranty work at no cost to Sciton." (Ex. 1, p. 8) (emphasis added.)

71.     The Agreement provides that neither Party may recover damages for loss of prospective profits upon termination.  The "Limitation on Liability" clause provides, in relevant part: "In the event of termination by either party . . . , neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of Sciton or Representative [Clarion]." (Ex. 1, p. 10) (emphasis added.)

72.     Upon information and belief, Sciton has and/or will perform some warranty labor for warranties arising during the pendency of the Agreement.

73.     The Agreement does not specifically address warranty labor performed after termination of the Agreement.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)

22

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

74.    Neither the Agreement nor the Parties' course of dealing and/or performance address the valuation of the warranty labor performed after termination of the Agreement.

75.    During the wind-up process, Clarion offered to compensate Sciton for Sciton's costs purportedly related to the warranty labor.  Its offer was premised upon the customary cost margin within the trade.  Sciton refused, and further refused to provide evidence of its actual costs.

### vi.    Sale and Service of Sciton Devices After May 9, 2012

76.    The "Service Responsibility" clause of the Agreement provides, in relevant part: "Sales and service responsibility by the Representative [Clarion] will stop as of the termination date . . . . Representative shall not present itself as an authorized Sciton representative for the purpose of providing service for the Products following termination of the Agreement." (Ex. 1, p. 10) (emphasis added.)

77.    Following termination of the Agreement, Clarion has not presented itself as an authorized Sciton representative for the purpose of servicing Sciton products.

78.    Nothing in the Agreement and/or otherwise precludes Clarion from selling and/or servicing Sciton materials after May 9, 2012, provided that Clarion does not present itself as an authorized Sciton representative for the purpose of providing service.

### COUNT I - BREACH OF CONTRACT (AGREEMENT/RMA CONTRACTS)

79.    Clarion hereby re-alleges paragraphs 1 through 78 as though set forth fully herein.

80.    The Agreement is a binding, legally enforceable contract between Clarion and Sciton.  Through the RMA Contracts, the Parties modified the Agreement.

81.    In the alternative, RMA Contracts are separate, legally enforceable contracts to

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
23

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

which Sciton is bound.

82.    When issuing the Purchase Orders, Clarion offered to pay the prices reflected in Sciton's Quoters and/or Price Lists.  Sciton accepted these price terms through issuance of the RMA Orders.

83.    Clarion has paid the agreed-upon purchase price for all items identified in Sciton's RMA Spreadsheet.

84.    Both prior to and after Sciton's initiation of this lawsuit, Clarion offered to return all defective parts in its current possession, consistent with the Parties' course of dealing and/or performance.  Sciton refused to accept the same.  Clarion stands ready, willing, and able to ship the defective parts.

85.    Clarion offered to compensate Sciton for its costs arising from the warranty labor in an amount not to exceed $130,611.  Sciton refused, and failed to provide evidence of its actual costs.

86.    Clarion performed under the Agreement and/or RMA Contracts.    In the alternative, Sciton frustrated Clarion's efforts to perform.

87.    All conditions required for Sciton's performance have occurred.

88.    Sciton breached the Agreement and/or RMA Contracts when it:  (a) demanded that Clarion pay the purported retail price for the items on Sciton's RMA Spreadsheet, where Clarion previously paid the agreed-upon price; (b) refused to accept the return of materials unless the items traced to the original Serial Number; (c) failed to accurately, consistently track those items returned over time (both serialized and non-serialized items); (d) refused to credit Clarion $113,000 for core filters undisputedly returned; and (e) refused to credit Clarion for other service

parts for which it promised a credit in the relevant RMA Orders.

89.    Clarion has been damaged by Sciton's refusal to credit core charges in the amount of $141,000. Due to Sciton's inaccurate, inconsistent record-keeping, the remaining damages are too difficult to ascertain without reviewing additional documentation in Sciton's possession. As such, the remaining damages will be established according to proof.

## COUNT II - BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

90.    Clarion hereby re-alleges Paragraphs 1 through 89 as though set forth fully herein.

91.    Clarion and Sciton entered into a binding, legally enforceable contract(s) in the form of the Agreement and/or the RMA Contracts.

92.    The Agreement and RMA Contracts imposed upon Sciton a duty of good faith and fair dealing.

93.    Clarion performed under the Agreement and/or RMA Contracts.    In the alternative, Sciton frustrated Clarion's efforts to perform.

94.    All conditions required for Sciton's performance have occurred.

95.    Sciton breached its duties of good faith and fair dealing, unfairly interfering with Clarion's rights to receive the benefits of the Parties' contractual agreements, when it (a) failed to maintain consistent, accurate records of the RMA process; (b) refused to provide evidence of its cost for purposes of the warranty valuation; (c) used Clarion's confidential customer data to implicitly assume Clarion's Service Contracts without compensation to Clarion, such that it was unjustly enriched to Clarion's detriment; (d) withdrew warranty support for used and/or demo devices, contrary to its prior course of dealing and/or performance; (e) disrupted Clarion's sales of used devices during the wind-up period; and (f) frustrated Clarion's efforts to rightfully sell

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)
25

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

the new, used, and off-lease materials.

96.    Clarion was harmed by Sciton's breach.   The amount of the breach will be established according to proof.

## COUNT III - VIOLATION OF UNFAIR COMPETITION LAW

97.    Clarion hereby re-alleges paragraphs 1 through 96 as though set forth fully herein.

98.    Sciton engaged in unfair business practices that were immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers and/or Clarion, in violation of California's Unfair Competition Law.   These unfair business practices include, but are not limited to: (a) demanding that Clarion pay the purported retail price for the defective parts on the RMA Spreadsheet, despite the fact that Clarion already paid the agreed-upon purchase price; (b) failing to maintain accurate, consistent records; (c) refusing to accept the return of defective parts, where there is no contractual basis for said actions; (d) opening multiple RMAs for a single item; (e) demanding compensation for parts previously returned; and (f) disrupting Clarion's sales of used devices during the wind-up period.

99.    Clarion's injuries are substantial, not outweighed by any countervailing benefit to consumers or to completion, and are not injuries it could have reasonably avoided.

100.    Clarion is entitled to restitution and/or injunctive relief against Sciton's unfair business practices.  Due to Sciton's inaccurate, inconsistent record-keeping practices, the amount of restitution cannot be readily determined without reviewing additional documentation in Sciton's possession.  As such, the remaining damages will be established according to proof.

## COUNT IV - NEGLIGENT AND/OR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

101.    Clarion hereby re-alleges Paragraphs 1 through 100 as though set forth fully

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
26

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

herein.

102.    External Affairs agreed to purchase a Profile SR from Clarion for $43,000.

103.    Clarion and External Affairs were in an economic relationship that probably would have resulted in an economic benefit to Clarion.  Sciton knew of this relationship.

104.    Sciton negligently and/or intentionally disrupted this relationship.  As admitted by Sciton's President in an email dated June 9, 2012, Sciton "decided to undo as many [of Clarion's used device sales] as we could."  This conduct was a wrongful breach of the duty of good faith and fair dealing and a violation of the Unfair Competition Law.

105.    Sciton disrupted Clarion's prospective economic relationship with External Affairs, causing Clarion harm in the form of a lost sale.

106.    Sciton's wrongful conduct was a substantial factor in causing External Affairs to cancel the sale.

107.    Clarion sustained damages arising from Sciton's negligent and/or intentional conduct for its lost profits from the External Affairs sale, totaling approximately $21,500.

**COUNT V - DECLARATORY RELIEF**
**(VALUE OF WARRANTY LABOR)**

108.    Clarion hereby re-alleges paragraphs 1 through 107 as though set forth fully herein.

109.    There is an actual, ripe case or controversy within this Court's jurisdiction as to the appropriate valuation of the warranty labor.

110.    Under the Agreement, Sciton is entitled to compensation for its costs for the warranty labor;  Sciton is not entitled to any profit for the warranty labor.  Sciton contends otherwise.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and**
**Counterclaim** (Case No. 13-1334 HRL)
27

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

111.    This Court should exercise its jurisdiction to resolve these issues for purposes of judicial administration, comity, and fairness to the Parties.

## COUNT VI - DECLARATORY RELIEF
### (CLARION SERVICE CONTRACTS)

112.    Clarion hereby re-alleges paragraphs 1 through 111 as though set forth fully herein.

113.    There is an actual, ripe case or controversy within this Court's jurisdiction as to whether Clarion has the right to refuse assignment of the Clarion Service Contracts to Sciton under the Agreement or otherwise.

114.    Clarion has the right to refuse assignment of the Service Contracts to Sciton. Sciton contends otherwise.

115.    This Court should exercise its jurisdiction to resolve these issues for purposes of judicial administration, comity, and fairness to the Parties.

## COUNT VII - DECLARATORY RELIEF
### (SALE AND SERVICE AFTER MAY 9, 2012)

116.    Clarion hereby re-alleges paragraphs 1 through 115 as though set forth fully herein.

117.    There is an actual, ripe case or controversy within this Court's jurisdiction as to whether Clarion has the right to sell and/or service Sciton materials after May 9, 2012.

118.    Clarion has the right to sell and/or service Sciton materials after May 9, 2012. Sciton contends otherwise.

119.    This Court should exercise its jurisdiction to resolve these issues for purposes of judicial administration, comity, and fairness to the Parties.

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)
28

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

## COUNT VIII - ACCOUNTING

120.    Clarion hereby re-alleges paragraphs 1 through 119 as though set forth fully herein.

121.    Sciton maintained multiple sets of record-keeping books.  It did not maintain these records in an accurate, consistent manner.  Sciton did not maintain accurate records of the RMA process.

122.    Given Sciton's inaccurate, inconsistent records, the specification of amounts due to Clarion is so complicated that an ordinary legal action demanding a fixed sum is impracticable.

123.    Given Sciton's inaccurate, inconsistent records, the identification of defective parts required to close RMAs, if any, is so complicated that an ordinary legal action demanding a fixed sum is impracticable.

124.    Clarion therefore seeks an accounting in this matter.  The accounting should encompass all documents, records, electronically stored information, service parts, capital equipment and other tangible evidence in Sciton's possession relevant to reconciliation of the RMA process.

### PRAYER FOR RELIEF

WHEREFORE, Clarion prays for the following relief:

1.    For dismissal with prejudice and without costs and/or attorneys' fees of all causes of action asserted in Sciton's Complaint.

2.    For entry of judgment against Sciton for all damages caused by Sciton's breach of the Agreement and/or RMA Contracts in an amount to be proven at trial.

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

3.      For entry of judgment against Sciton for all damages caused by Sciton's breach of the duties of good faith and fair dealing in an amount to be proven at trial.

4.      For entry of judgment against Sciton for restitution and injunctive relief due to Sciton's violation of the Unfair Competition Law.

5.      For entry of judgment against Sciton for damages caused by Sciton's negligent and/or intentional interference with prospective economic advantage in an amount to be proven at trial.

6.      For entry of judgment declaring as follows:  To the extent that Sciton performed warranty labor after May 9, 2012 for warranties arising before termination of the Agreement, Sciton is entitled to compensation for its actual costs of this warranty labor in sums not to exceed $130,611.  Sciton is not entitled to any profit for the warranty labor.

7.      For entry of judgment declaring as follows:  Clarion has the right to refuse assignment of the Clarion Service Contracts to Sciton.

8.      For entry of judgment declaring as follows:  Clarion had and/or has the right to sell and/or service Sciton materials after May 9, 2012.

9.      For entry of judgment ordering an accounting of all documents, records, electronically stored information, service parts, capital equipment and other tangible evidence in Sciton's possession relevant to reconciliation of the RMA process.

10.     For an award of prejudgment interest at the maximum amount permitted by the Agreement, RMA Contracts, or by law as to any unpaid amounts due and owing.

11.     For an award of attorneys' and expert witnesses' fees, costs, disbursements and expenses incurred herein to the fullest extent as provided by contract, statute, or otherwise.

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

12.     For the right to move to amend the Counterclaim to conform with the evidence produced at trial.

13.     For such further and additional relief as the Court deems just and proper.


DATED this 1st day of July, 2013.

OGDEN MURPHY WALLACE, P.L.L.C.


By      /s/ Emily H. Gant
        Emily Harris Gant (WSBA No. 35679)
        Admitted *Pro Hac Vice*
        Attorneys for Defendant Clarion Medical
        Technologies, Inc.

LeCLAIRRYAN


By      /s/ Emily H. Gant, with email permission
        Brian T. Hafter (CA Bar No. 173151)
        Attorneys for Defendant Clarion Medical
        Technologies, Inc.

EHG1081383.DOC;1\12568.00000\
**Clarion Medical Technologies, Inc.'s Answer and
Counterclaim** (Case No. 13-1334 HRL)
31

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

## CERTIFICATE OF SERVICE

I certify under the laws of the United States of America that on the 1st day of July, 2013, I caused a true and correct copy of the foregoing to be electronically served upon the following:

| Counsel for Plaintiffs | Via ECF |
|---|---|
| Thomas W. Burch, III<br>DeHay & Elliston, L.L.P.<br>1111 Broadway, Suite 1950<br>Oakland, CA 94607<br>tburch@dehay.com | |
| **Co-Counsel for Defendant** | **Via Email** |
| Brian T. Hafter<br>LeClairRyan<br>44 Montgomery Street, 18th Floor<br>San Francisco, CA 94104<br>Brian.Hafter@leClairryan.com | |

DATED this 1st day of July, 2013.

/s/ Emily H. Gant
Emily Harris Gant (WSBA No. 35679)
Admitted *Pro Hac Vice*

EHG1081383.DOC;1\12568.000001\
**Clarion Medical Technologies, Inc.'s Answer and Counterclaim** (Case No. 13-1334 HRL)
32

OGDEN MURPHY WALLACE, P.L.L.C.
901 Fifth Avenue, Suite 3500
Seattle, Washington 98164-2008
Tel: 206.447.7000/Fax: 206.447.0215

# EXHIBIT 1

*Sciton, Inc. v. Clarion Medical Technologies, Inc.*

Case No. C13-1334 HRL

Feb. 20, 2004

# International Representative Agreement

### Exclusive

 **ADDRESS:** 925 Commercial Street, Palo Alto, CA 94303, USA

**REPRESENTATIVE ADDRESS:**  15-550 Trillium Drive

Kitchener, Ontario
**N2R 1A7**

Tel:    (519) 895-0864
Fax:    (519) 895-0806

**EFFECTIVE DATE:** date signed by both parties

Rev. 5 – 2/20/04

## TABLE OF CONTENTS

| Item | | Page Number |
|---|---|---|
| | Preamble | 3 |
| 1. | Scope of the Agreement | 3 |
| 2. | Responsibilities of Representative | 4 |
| 3. | Responsibilities of Sciton | 5 |
| 4. | Terms of Purchase of Products by Representative | 6 |
| 5. | Compliance with Government Regulations | 8 |
| 6. | Defects and Warranty Period | 8 |
| 7. | Service | 9 |
| 8. | Term and Termination | 9 |
| 9. | Limited Liability to Representative and Others | 12 |
| 10. | Property Rights and Confidentiality | 12 |
| 11. | Trademarks and Trade Names | 12 |
| 12. | Patent, Copyright, and Trademark Indemnity | 13 |
| 13. | General Provisions | 15 |

**Exhibits**

A - Products Covered by This Agreement/Territory                                   17

B - Representative Net Prices                                                      18

C - Installation and Warranty/Service Transfer Amounts                            19

D - Win/Loss Reports                                                              20

E - Standard Terms and Conditions                                                21

F – Comprehensive List of Products Currently Offered by Representative or Affiliates  29

**PREAMBLE**

This Agreement is hereby made and entered into by and between Sciton, a Delaware corporation with its principal offices located at 845 Commercial Ave., Palo Alto, CA 94303, U.S.A. and Coherent-AMT Inc. hereinafter called "Representative" whose principal offices are located at **15-550 Trillium Drive, Kitchener, Ontario N2R 1A7**

The parties agree as follows:

1.    **SCOPE OF THE AGREEMENT**

Subject to the terms and conditions set forth in this Agreement, Sciton hereby appoints the Representative as the Official Sales Representative for the products defined in Exhibit A (hereinafter called "**Products**") in the territory set forth in Exhibit A (the "**Territory**"). For so long as Representative is complying with this Agreement, Sciton shall not appoint any other Representative with responsibility for the sale of Products in the Territory.

However, Sciton reserves the right to conduct direct business in the territory under two limited conditions:

1.    Recognizing that for some period Representative will be distributing competing current products (as specified in Exhibit F), in the event that Sciton has provided a lead or contact to the Representative and after mutual discussion it is determined that the Representative chooses to recommend for sale a competitive product from Representative's current product line, as set forth on Exhibit F, in lieu of a Sciton product, then Sciton reserves the right to sell directly its own product. Subsequent to the sale, the labor portion of the warranty will be transferred to the Representative with a payment of 4% of the end user price. Representative will receive no other consideration or commission.

2.    In the event that a volume purchaser in the territory approaches Sciton with a request for a direct sale because the Representative can't meet the pricing objectives of the customer, upon notice to Representative Sciton reserves the right to create a "House Account". Subsequent to the sale, the labor portion of the warranty will be transferred to the Representative with a payment of 5% of the end user price. The Representative will also receive a sales commission according to the following table:

| Number of Units/year | Sales Commission as a % of End User Price |
|---|---|
| 4-7 units | 10% |
| 8-11 units | 8.0% |
| >12 units | 6.0% |

In either case of direct sale, no such business shall take place without extensive discussion between the Representative and Sciton.

The Representative undertakes to respect its boundaries and not to supply or offer Products to customers outside of the Territory or to export-trading companies.

Inside of the Territory, the Representative shall pursue aggressive sales policies and procedures to realize the maximum sales potential for the Products in the Territory.

The relationship of Sciton and Representative established by this Agreement is that of independent contractors, and nothing contained herein shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, joint-venturers, co-owners or otherwise as participants in a joint or common undertaking, or (iii) allow Representative to create or assume any obligation on behalf of Sciton for any purpose whatsoever. All financial obligations associated with Representative's business are the sole responsibility of Representative. All sales and other agreements between Representative and its customers are Representative's exclusive responsibility and shall have no effect on Representative's obligations under this Agreement. Representative shall be solely responsible for, and shall indemnify and hold Sciton free and harmless from, any and all claims, damages or lawsuits (including Sciton's attorneys' fees) arising out of the negligent acts or omissions of Representative, its employees or its agents.

## 2.   RESPONSIBILITIES OF REPRESENTATIVE

The Representative will look after the general interests of Sciton in connection with performing the services set forth in this Agreement. Representative shall use its best effort to fully and actively promote the purchase and use of the Products. Representative shall have the following responsibilities:

(a)   Maintain active contacts with all potential and actual customers and users of the Products.

(b)   Keep Sciton fully informed of all governmental, commercial, and industrial activities and plans which do or could affect the sale of Products in the Territory via monthly written reports that are due on the first Monday of each month.

(c)   Provide technical liaison between Sciton and the customer in the development and analysis of specifications and in language interpretation of tenders and bids.

(d)   Achieve a sufficient level of understanding of the Products to enable Representative to provide basic technical information to the customer and effectively sell the Products. Representative will arrange with Sciton for technical service training and sales training on the Products before representing itself to any customer that it is an authorized Representative of Sciton. Training will take place at Sciton's place of business in Palo Alto, CA or at another location if agreed to by Sciton.

(e)   Obtain customer orders directly or on behalf of Sciton and provide assistance to customers in fulfilling these requirements.

(f)   Representative will provide rolling quarter forecasts within 30 days of the commencement of the next calendar quarter of predicted sales by Product and such additional sales data as is needed to effectively plan sales in the Territory.

(g)   At its own expense the Representative will undertake publicity in journals for the Products, maintain suitable demonstration inventory and will exhibit the Products at suitable trade fairs within the Territory. Sciton will be supplied with regular reports regarding these activities.

(h)   The Representative shall maintain during the terms of the Agreement, a complete record of all sales of the Products, showing customer name, date of sale, shipping date, instrument model, serial number, and sales order acknowledgement and invoices for all Products covered by this Agreement as well as special terms of the sale, including warranty, installation date and other appropriate information. This information shall be supplied to Sciton upon request. Representative shall notify Sciton on each purchase order of the name and address of the end user and the sales price. The Representative shall also keep Sciton informed about competitive/market information through Win/Loss reports using the format shown in Exhibit D.

-4-

(i)      Other than with respect to the products currently being sold by the Representative and its affiliated companies as of the Effective Date and listed comprehensively in Exhibit F, the Representative shall not promote the sale of, or carry on any activities involving the selling of any products manufactured or offered for sale by another person, firm, corporation, or partnership in competition with the Products of Sciton. This specifically means that no products in the same market application (even if differentiated by price or other criteria) other than Sciton's shall be represented by the Representative or its affiliated companies.

(j)      The Representative shall not purchase Sciton products for the purpose of renting the products to customers in any territory without written consent from Sciton.

(k)      For European sales the Representative will maintain installation and service records in accordance with European Standard EN 46001. This includes the use of procedures for product identification and traceability and corrective and preventive action. If needed, Representative will notify the appropriate European Authorities and submit the correct forms as required by individual country's laws.

## 3.    RESPONSIBILITIES OF SCITON

*Materials*

Sciton shall promptly provide Representative with marketing and technical information concerning the Products as well as reasonable quantities of brochures (at Representative's expense), instructional material, advertising literature, and other Product data, with all such material printed in the English language.

*Response to Inquiries*

Sciton shall promptly respond to all inquiries from Representative concerning matters pertaining to this Agreement.

*Testing*

Sciton shall test all Products before shipment to Representative.

*Delivery Time*

Sciton shall minimize delivery time as much as possible and use its reasonable best efforts to fulfill delivery obligations as committed in acceptances.

*Territorial Inquiries*

Sciton shall submit to Representative any inquiry originating from the Territory.

*Quotations to Exporters*

Sciton shall refrain from giving quotations to exporters for Products to be shipped to the Territory, unless Representative and Sciton agree otherwise.

*Developments*

Sciton shall inform Representative of new product developments and Representative shall treat this information confidentially until the product is officially released.

-5-

*Training*

Sciton will provide sales and service training for Representative's personnel from time to time. It is required for Representative's personnel to attend these seminars. Cost for transport and living expenses for Representative's personnel to attend these seminars will be borne by the Representative.

4.    **TERMS OF PURCHASE OF PRODUCTS BY REPRESENTATIVE**

*Terms and Conditions*

All purchases of Products by Representative from Sciton during the term of this Agreement shall be subject to the terms and conditions of this Agreement.

*Prices*

All prices are ex factory (as defined in Section 2319 of the California Uniform Commercial Code) Sciton's plant currently located at the address listed for Sciton at the beginning of this Agreement. The purchase price to Representative for each of the Products ("**Purchase Price**") shall be as set forth in Exhibit B attached hereto. The difference between Representative's Purchase Price and Representative's selling price to its customers shall be Representative's sole remuneration for sale of the Products. Sciton has the right at any time to revise the prices in Exhibit B with sixty (60) days advance written notice to Representative. Such revisions shall apply to all orders received after the effective date of revision. Price increases shall not affect unfulfilled purchase orders accepted by Sciton prior to the effective date of the price increase.

*Taxes*

Representative's Purchase Price does not include any federal, state or local taxes that may be applicable to the Products. When Sciton has the legal obligation to collect such taxes, the appropriate amount shall be added to Representative's invoice and paid by Representative unless Representative provides Sciton with a valid tax exemption certificate authorized by the appropriate taxing authority.

*Order and Acceptance*

All orders for Products submitted by Representative shall be initiated by written purchase orders sent to Sciton and requesting a delivery date during the term of this Agreement; provided, however, that an order may initially be placed orally or electronically if a confirmational written purchase order is received by Sciton within a reasonable time after said oral or electronic order but in any case before shipment. No order shall be binding upon Sciton until accepted by Sciton in writing (in the form of PO confirmation), and Sciton shall have no liability to Representative with respect to purchase orders that are not accepted. Sciton shall notify Representative of the acceptance or rejection of an order and of the assigned delivery date for accepted orders within a reasonable time. No partial shipment of an order shall constitute the acceptance of the entire order, absent the written acceptance of such entire order. Sciton shall use its reasonable best efforts to deliver Products at the times specified either in its quotation or in its written acceptance of Representative's purchase orders.

*Terms of Purchase Orders*

To the extent consistent with the terms set forth in this Agreement, Sciton's standard terms and conditions, set forth as Exhibit E hereto, shall be applicable to the shipment of any Product to Representative. Representative's purchase orders submitted to Sciton from time to time with respect to Products to be purchased hereunder shall be governed by the terms of this Agreement, and nothing contained in any such purchase order shall in any way modify such terms of purchase or add any additional terms or conditions.



*Payment*

Full payment of Representative's Purchase Price for the Products and spare parts sold to end users (including any freight, taxes or other applicable costs initially paid by Sciton but to be borne by Representative) shall be made by Representative to Sciton on terms substantially similar to those Sciton provides to its direct customers. This means, orders will be booked upon receipt of a PO and a $10,000 deposit. Balance of payment is due upon installation if privately financed, or is due promptly upon funding by a third party leasing company. In no case shall the terms extend longer than net 15 days from time of shipment except in the extraordinary case that a unit is found substantially not to function at time of installation. These cases will be handled on a case by case basis by discussion and negotiation between Representative and Sciton. In such a case where additional delays in payment are incurred as a result of a Sciton failure to perform, Representative should obtain agreement from Sciton prior to extending terms beyond net 15 days. Agreement to a reasonable extension will not be unreasonably withheld. <u>Payment terms for a limited number of demonstration units to be held in Representative's inventory will be extended by prior negotiation and agreement.</u> Payment shall be in U.S. dollars and shall be effected by means of an irrevocable and confirmed letter of credit drawn on a California bank approved by Sciton or by wire transfer; the letter of credit shall be upon terms acceptable to Sciton, shall allow for partial shipments, and shall be in an amount equal to Representative's Purchase Price for the Products plus all applicable taxes, shipping charges, and other charges to be borne by Representative. All exchange, interest, banking, collection, and other charges shall be at Representative's expense. At such time as Sciton may grant a line of credit to Representative, payment terms shall be net thirty (30) days, and payment shall be made by wire transfer, check or other instrument approved by Sciton. Payment due to Sciton is not contingent upon Representative receiving payment from end user first. Any invoiced amount not paid when due shall be subject to a service charge of one and one-half percent (1.5%) per month. Representative shall pay all of Sciton's costs and expenses (including reasonable attorneys' fees) to enforce and preserve Sciton's rights under these payment conditions.

*Shipping*

All Products delivered pursuant to the terms of this Agreement shall be suitably packed for air freight shipment in Sciton's standard shipping cartons, marked for shipment at Representative's address set forth above, and delivered to Representative or its carrier agent ex factory Sciton's plant, at which time (subject to Subsection below) title to such Products and risk of loss shall pass to Representative. Unless otherwise instructed in writing by Representative, Sciton shall select the carrier. All freight, insurance, and other shipping expenses, as well as any special packing expense, shall be paid by Representative. Representative shall also bear all applicable taxes, duties, and similar charges that may be assessed against the Products after delivery to the carrier at Sciton's plant.

*Rejection of Products*

Representative shall inspect all Products promptly upon receipt thereof and may reject any Product that fails in any material way to meet the specifications set forth in Sciton's current brochure for that Product. Any Product not properly rejected within thirty (30) days of receipt of that Product by Representative (the "Rejection Period") shall be deemed accepted. To reject a Product, Representative shall, within the Rejection Period, notify Sciton in writing or electronically of its rejection and request a Return Material Request ("RMR") number. Sciton shall provide the RMR number in writing or electronically to Representative within fifteen (15) days of receipt of the request. Within ten (10) days of receipt of the RMR number, Representative shall use its best efforts to return to Sciton the rejected Product, freight prepaid, in its original shipping carton with the RMR number displayed on the outside of the carton. Sciton reserves the right to refuse to accept any rejected Products that do not bear an RMR number on the outside of the carton. As promptly as possible but no later than thirty (30) working days after receipt by Sciton of properly rejected Products, Sciton shall, at its option and expense, either repair or replace the Products. Sciton shall pay the shipping charges back to Representative for properly rejected Products; otherwise, Representative shall be responsible for the shipping charges.

*Return of Products after Rejection Period*



After the Rejection Period, Representative may not return a Product to Sciton for any reason without Sciton's prior written consent. For any Product for which Sciton gives such consent, Sciton shall charge Representative a restocking fee equal to fifteen percent (15%) of Representative's Purchase Price for that Product and shall credit the balance of the Purchase Price to Representative's account. Representative shall be responsible for all shipping charges.

*Reservation of Title*

Transfer of title for each Product shipped to Representative shall be subject to full payment of the Purchase Price therefore. Until such full payment, the Product shall remain the property of Sciton. For all Products to which Sciton retains title, Representative shall (i) carry full insurance on the Products throughout the time they are in Representative's possession and (ii) segregate those Products from other products in Representative's inventory.

## 5.     COMPLIANCE WITH GOVERNMENT REGULATIONS

Representative shall not sell any Products to, or for the use of, any ultimate purchaser with which Sciton could not deal under the laws or regulations of the United States, including, without limitation, the regulations of the United States Departments of Commerce, Defense, State and Treasury, and Representative shall comply with all other laws and regulations of the United States and any other cognizant jurisdiction relating to the sale of Sciton's Products. Willful violation of such regulations shall be considered just cause for the immediate and unqualified cancellation of this Agreement by Sciton without any liability of Sciton. Representative further agrees to immediately transmit to Sciton any information which may come to its attention concerning violation of such regulations by Representative's customers. Representative shall be responsible for obtaining any required non-U.S. governmental authorizations, such as import licenses, regulatory notification, regulatory certification, regulatory approval, safety approval or foreign exchange permits. Sciton shall not be liable if any authorization is delayed, denied, revoked, restricted, or not renewed; Representative shall bear all such risks and costs caused thereby and shall not be relieved thereby of any of its obligations to pay Sciton.

## 6.     DEFECTS AND WARRANTY PERIOD

Sciton warrants its Products to Representative's customer under the terms of Sciton's standard warranty set forth in ▨▨▨▨ and the Service Policy in ▨▨▨▨ Labor on all warranty work is to be provided by the Representative at no cost to Sciton. Unless otherwise agreed in advance, all returned material, whether in warranty or not, must be sent to Sciton transportation and insurance paid. Sciton will be responsible for any freight and insurance on materials returned to Representative. Consumable items or damage to the Products occurring due to negligence or inexpert handling on the part of the Representative or its customer, or due to overloading or natural wear and tear, are excluded from the warranty.

## 7.     SERVICE

Representative shall retain and maintain the services of a sufficient number of Sciton certified service engineers, and shall use its best efforts to adequately service and maintain (both in and out of warranty) all Products in the Territory. Representative shall, at the request of Sciton, provide Sciton with service reports as to the work performed in each instance. The Representative shall offer service agreements, as described in the Sciton Price List.

Representative shall promptly report any customer complaints and/or Product malfunctions which could affect the safe operation of the Product. Representative shall also provide copies of any related service reports upon request of Sciton.

Representative shall purchase and maintain an adequate inventory of spare parts for Sciton Products, the adequacy of which shall be determined jointly by Representative and Sciton. Representative shall use such inventory for all repairs and replacements, whether or not necessary under Sciton's warranty. If

- 8 -

Representative uses a part to service a claim under Sciton's warranty, Sciton shall replace that part in Representative's inventory upon receipt of a complete report on the failure and return of a failed part to Sciton. Warranty on the part will be the balance of the original warranty of the system paid for by the customer.

Representative agrees to report status of inventory to Sciton on a quarterly basis. Representative agrees to warranty its workmanship for at least ninety (90) days after completion thereof.

Representative shall not make warranty commitments on behalf of Sciton without the written approval to do so from Sciton.

Some customers may transfer the Products from one Territory to another. The customers shall have the option to either perform the service on such Products themselves or elect to pay the Representative for services performed.

## 8.    TERM AND TERMINATION

This Agreement shall continue in force from the date hereof unless terminated earlier under the provisions of this Section 8.

### Termination for Convenience

This Agreement may be cancelled by either party for any reason or no reason, whether or not extended beyond the first year, by giving the other party written notice ninety (90) days in advance. If Sciton terminates this Agreement under the provisions of this agreement, then Sciton shall, at Representative's option, repurchase Representative's then-current inventory purchased during the previous 12 months at Representative's original Purchase Price less 4% of the original Purchase Price per month since receiving each piece of equipment, and shall bear the shipping costs for the return to Sciton of that inventory.

### Termination for Cause

If either party defaults in the performance of any provision of this Agreement, then the non-defaulting party may give written notice to the defaulting party that if the default is not cured within thirty (30) days of the date of receipt of the notice, the Agreement will be terminated. If the non-defaulting party gives such notice and the default is not cured during the thirty-day period, then the Agreement shall automatically terminate at the end of that period.

### Termination for Insolvency

This Agreement shall terminate, without notice, (i) upon the institution by or against Representative of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Representative's debts, (ii) upon Representative's making an assignment for the benefit of creditors, or (iii) upon Representative's dissolution or ceasing to do business.

### Fulfillment of Orders upon Termination

Upon termination of this Agreement for other than Representative's breach, Sciton shall continue to fulfill, subject to the terms of Section 4 above, all orders accepted by Sciton prior to the date of termination. Requests for scheduled delivery dates beyond the normal lead-time will not be honored.

### Termination Resulting from Merger or Acquisition

In the event that Sciton merges or is acquired and Representative is immediately terminated by the new entity, Representative shall be entitled to partial compensation for long sales cycle business that closes within 6 months of the sale or acquisition and which is not covered by other provisions of this Subsection.

This compensation shall be limited to customers documented on an Active Sale List provided by Representative within 2 weeks of termination. This List should contain only customers that Representative has performed live demonstrations for along with the date the demonstration was provided in the customers office and may contain up to the greater of five (5), or the total number of orders received from the Representative by Sciton within the last 6 months. The list must contain customer name and contact information. Any orders represented on this List and accepted by the new entity which occur within 6 months of acquisition or merger will be compensated at the rate of 10% of the sale price.

*Transition*

Upon termination of this Agreement, Representative shall diligently cooperate with Manufacturer to effect a smooth and orderly transition in the sale of the Products in the Territory. From the time that a notice of termination is received by either party until the effective termination date, Representative shall refer all Product inquiries to Sciton, shall support Sciton's existing customers in the Territory (but shall not receive new orders from them), and shall cooperate fully with any newly appointed representative.

*Return of Materials*

All trademarks, trade names, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, and sales aids of every kind with respect to the Products shall remain the property of Sciton. Within thirty (30) days after the termination of this Agreement, Representative shall prepare all such items in its possession for shipment, as Sciton may direct, at Sciton's expense. Representative shall not make or retain any copies of any confidential items or information that may have been entrusted to it. Effective upon the termination of this Agreement, Representative shall cease to use all trademarks, marks, and trade names of Sciton.

*Service Responsibility*

Sales and service responsibility by the Representative will stop as of the termination date, except that Representative will be responsible for installation for Products that it ordered from Sciton through the termination date. Representative shall not present itself as an authorized Sciton representative for the purpose of providing - service for the Products following termination of this Agreement. -

*Limitation on Liability*

In the event of termination by either party in accordance with any of the provisions of this Agreement, neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of Sciton or Representative. Termination shall not, however, relieve either party of obligations incurred prior to the termination.

*Survival of Certain Terms*

The provisions of Sections 4, 5, 6, 8, 9, 10, 11, 12, and 13, shall survive the termination of this Agreement for any reason. All other rights and obligations of the parties shall cease upon termination of this Agreement.

9.     **LIMITED LIABILITY TO REPRESENTATIVE AND OTHERS**

SCITON'S LIABILITY ARISING OUT OF THIS AGREEMENT AND/OR SALE OF THE PRODUCTS SHALL BE LIMITED TO THE AMOUNT PAID BY THE CUSTOMER FOR THE PRODUCT. IN NO EVENT SHALL SCITON BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS BY ANYONE. IN NO EVENT SHALL SCITON BE LIABLE TO REPRESENTATIVE OR ANY OTHER ENTITY FOR ANY SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES, HOWEVER

- 10 -

CAUSED, WHETHER FOR BREACH OF CONTRACT, NEGLIGENCE OR OTHERWISE, AND WHETHER OR NOT SCITON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. THE ESSENTIAL PURPOSE OF THIS PROVISION IS TO LIMIT THE POTENTIAL LIABILITY OF SCITON ARISING OUT OF THIS AGREEMENT AND/OR SALE OF THE PRODUCTS.

10.    PRODUCT LIABILITY INDEMNITY

Sciton agrees to provide Representative with a liability insurance certification with a minimum of $2,000,000.00 (USD) coverage naming the Representative as an insured entity.

11.    **PROPERTY RIGHTS AND CONFIDENTIALITY**

*Property Rights*

Representative agrees that Sciton owns all right, title, and interest in the product lines that include the Products now or hereafter subject to this Agreement and in all of Sciton's patents, trademarks, trade names, inventions, copyrights, know-how, and trade secrets relating to the design, manufacture, operation or service of the Products. The use by Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination of this Agreement for any reason such authorization shall cease.

*Conveys no Right to Manufacture or Copy*

The Products are offered for sale and are sold by Sciton subject in every case to the condition that such sale does not convey any license, expressly or by implication, to manufacture, duplicate or otherwise copy or reproduce any of the Products. Representative shall take appropriate steps with its customers, as Sciton may request, to inform them of and assure compliance with the restrictions contained in this Subsection 10.

*Confidentiality*

Representative acknowledges that by reason of its relationship to Sciton hereunder it will have access to certain information and materials concerning Sciton's business, plans, customers, technology, and products that are confidential and of substantial value to Sciton, which value would be impaired if such information were disclosed to third parties. Representative agrees that it will not use in any way for its own account or the account of any third party, nor disclose to any third party, any such confidential information revealed to it by Sciton. Representative shall take every reasonable precaution to protect the confidentiality of such information. Upon request by Representative, Sciton shall advise whether or not it considers any particular information or materials to be confidential. Representative shall not publish any technical description of the Products beyond the description published by Sciton (except to translate that description into appropriate languages for the Territory). In the event of termination of this Agreement, there shall be no use or disclosure by Representative of any confidential information of Sciton, and Representative shall not manufacture or have manufactured any devices, components or assemblies utilizing any of Sciton's confidential information.

12.    **TRADEMARKS AND TRADE NAMES**

During the term of this Agreement, Representative shall have the right to indicate to the public that it is an authorized Representative of Sciton's Products and to advertise (within the Territory) such Products under the trademarks, marks, and trade names that Sciton may adopt from time to time ("Sciton's Trademarks"). Representative shall not alter or remove any of Sciton's Trademarks applied to the Products at the factory. Nothing herein shall grant to Representative any right, title or interest in Sciton's Trademarks. At no time during or after the term of this Agreement shall Representative challenge or assist others to challenge Sciton's Trademarks or the registration thereof or attempt to register any trademarks, marks or trade names confusingly similar to those of Sciton.

- 11 -

*Approval of Representations*

All representations of Sciton's Trademarks that Representative intends to use shall first be submitted to Sciton for approval (which shall not be unreasonably withheld) of design, color, and other details or shall be exact copies of those used by Sciton. If any of Sciton's Trademarks are to be used in conjunction with another trademark on or in relation to the Products, then Sciton's mark shall be presented equally legibly, equally prominently than the other but nevertheless separated from the other so that each appears to be a mark in its own right, distinct from the other mark.

## 13.    PATENT, COPYRIGHT, AND TRADEMARK INDEMNITY

*Indemnification*

Representative agrees that Sciton has the right to defend, or at its option to settle, and Sciton agrees, at its own expense, to defend or at its option to settle, any claim, suit or proceeding brought against Representative or its customer on the issue of infringement of any United States or Canadian patent, copyright or trademark by the Products sold hereunder or the use thereof, subject to the limitations hereinafter set forth. Sciton shall have sole control of any such action or settlement negotiations, and Sciton agrees to pay, subject to the limitations hereinafter set forth, any final judgment entered against Representative or its customer on such issue in any such suit or proceeding defended by Sciton. Representative agrees that Sciton at its sole option shall be relieved of the foregoing obligations unless Representative or its customer notifies Sciton promptly in writing of such claim, suit or proceeding and gives Sciton authority to proceed as contemplated herein, and, at Sciton's expense, gives Sciton proper and full information and assistance to settle and/or defend any such claim, suit or proceeding for infringement of any United States or Canadian patent, copyright or trademark, or it is adjudicatively determined that the Products, or any part thereof, infringe any United States or Canadian patent, copyright or trademark, or it the sale or use of the Products, or any part thereof, is, as a result, enjoined, then Sciton may, at its option and expense: (i) procure for Representative and its customers the right under such patent, copyright or trademark to sell or use, as appropriate, the Products or such part thereof; or (ii) replace the Products, or part thereof, with other suitable Products or parts; or (iii) suitably modify the Products, or part thereof so as not to be infringing; or (iv) if the use of the Products, or part thereof, is prevented by injunction, remove the Products, or part thereof, and refund the aggregate payments paid therefore by Representative, less a reasonable sum for use and damage. Sciton shall not be liable for any costs or expenses incurred without its prior written authorization.

*Limitation*

Sciton assumes no liability for (i) infringement of patent claims covering completed equipment or any assembly, circuit, combination, method or process in which any of the Products may be used but not covering the Products standing alone; (ii) any trademark infringements involving any marking or branding not applied by Sciton or involving any marking or branding applied at the request of Representative; or (iii) the modification of the Products, or any part thereof, unless such modification was made by Sciton.

*Entire Liability*

The foregoing provisions of this Section 12 state the entire liability and obligations of Sciton and the exclusive remedy of Representative and its customers, with respect to any alleged infringement of patents, copyrights, trademarks or other intellectual property rights by the Products or any part thereof.

## 14.    GENERAL PROVISIONS

*Governing Law and Jurisdiction*

This Agreement shall be governed by and construed under the laws of the State of California, U.S.A., except that perfection of the title reserved by Sciton in Section 4 above shall be governed by the laws of



Representative's jurisdiction. The federal and state courts within the State of California, U.S.A., shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement. Representative hereby expressly consents to (i) the personal jurisdiction of the federal and state courts within California, (ii) service of process being effected upon it by registered mail sent to the address set forth at the beginning of this Agreement, and (iii) the uncontested enforcement of a final judgment from such court in any other jurisdiction wherein Representative or any of its assets are present.

*Entire Agreement*

This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the party to be charged.

*Notices*

Any notice required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested, addressed to the other party at the address shown at the beginning of this Agreement or at such other address for which such party gives notice hereunder. Such notice shall be deemed to have been given three (3) days after deposit in the mail.

*Force Majeure*

Nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, failure of suppliers, or any other reason where failure to perform is beyond the control and not caused by the negligence of the non-performing party.

*Nonassignability and Binding Effect*

A mutually agreed consideration for Sciton's entering into this Agreement is the reputation, business standing, and goodwill already honored and enjoyed by Representative under its present ownership, and accordingly, Representative agrees that its rights and obligations under this Agreement may not be transferred or assigned directly or indirectly without the prior written consent of Sciton such consent not to be unreasonably withheld. Subject to the foregoing sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

*Legal Expenses*

The prevailing party in any legal action brought by one party against the other and arising out of this Agreement shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its expenses, including court costs and reasonable attorneys' fees

*Counterparts*

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

SCITON INC.

By: Daniel K. Negus Ph.D.
Title: President
Date: Z- ZO - OY

- 13 -

**COHERENT-AMT INC.**

By: _____ William Roberts
Title:    President
Date: _____

- 14 -

## EXHIBIT A

### PRODUCTS COVERED BY THIS AGREEMENT

All products listed in the current Price Listings

### TERRITORY

Covered Territory includes Canada in its entirety.

**EXHIBIT B**

REPRESENTATIVE NET PRICES

*Standard Transfer Price*

The price list will be updated at least annually and the new prices will take effect 60 days after written notice is provided to Representative as described in Section (4).

Reference "ScitonCanadaQuoter 4.1.21" and future releases provided with 60 days notice.

| Description | | Price |
|---|---|---|
| **SCITON Profile MP Console** | | XXXXXX |
| **PLATFORM FOR THE OPERATION OF ONE TO FOUR LASER HEADS 3 SETS OF PROTECTIVE EYEWEAR** | | |
| | MLP ™, MicroLaserPeel Module™ | XXXXXX |
| | ONE ERBIUM HEAD | |
| | • MLP Coagulation Option | XXXXXX |
| | Laser Peel Long-Pulse Module | XXXXXX |
| | SECOND ERBIUM HEAD | |
| | VHR Vascular/Hair Reduction Module | XXXXXX |
| | ONE Nd:YAG HEAD | |
| | High-Speed Hair Reduction Module | XXXXXX |
| | SECOND Nd:YAG HEAD | |
| | ThermaScan™ Rejuvenation Module | XXXXXX |
| | ONE 1319 HEAD | |
| | BBL™ Broad-band Light Module | XXXXXX |
| | Flashlamp with 3 filters | |
| **LAPG™ ERBIUM LARGE AREA PATTERN GENERATOR** | | XXXXXX |
| **LAPG™ Nd:YAG LARGE AREA PATTERN GENERATOR** | | XXXXXX |
| **• LAPG Sapphire Contact Window** | | XXXXXX |
| **• ClearScan™ Microvascular accessory** | | XXXXXX |
| **Contact cooling accessory** | | XXXXXX |
| 250 WATT COOLING CAPACITY THERMOELECTRIC COOLER | | |
| 25MM SAPPHIRE CONTACT WINDOW | | |
| 50MM SAPPHIRE CONTACT WINDOW | | |
| | Broadband Articulated Delivery Arm | XXXXXX |
| | 3 Colimated Handpieces | |
| | Fiber Port accessory | XXXXXX |
| **Smoke Evacuator** | | XXXXXX |



EXHIBIT C

## SERVICE POLICY

Sciton represents and warrants that the Products shall be free from any substantial defects in material or workmanship at the time of delivery to the carrier for shipment to Representative. Provided that Sciton receives notice of any claimed defect in the Products within one year after the end user's receipt of the Product but in no event more than fifteen (15) months after Sciton has shipped the product to Representative. Sciton agrees to repair or replace any Product or part thereof. Notwithstanding the foregoing, this warranty shall not apply to any Sciton single use or semi-disposable Prducts or accessories beyond their initial use. Representative shall be responsible for coordinating all warranty repairs, or replacements of products. Representative agrees to perform all warranty service and Sciton shall not be responsible for Representative warranty related labor costs. Further, Representative shall retain all allegedly defective parts or Products for review by Sciton, at its option. Within thirty (30) days of Sciton receipt of notice that Representative has or intends to repair or replace a defective part or Product, Sciton shall notify Representative whether or not it will inspect the allegedly defective part or Product. In the event that Sciton, after review, determines in its sole judgment that the replaced part is not defective, Sciton shall have no obligation to replace the parts or Products used by Representative for such repairs. In addition, Representative shall provide a monthly report of installation of Products of end users, sites, including serial numbers, date of installation, name and location of customers, as well as a complete list of repairs and replacements of Products or parts thereof for which Representative is seeking replacement parts on Products. Notwithstanding the foregoing warranty, Sciton shall not warrant or service, and shall have no liability with respect to any claim of defects in material or workmanship for any product to the extent that they have been modified, enhanced, or in any way, abused or altered in an unauthorized manner by Representative or its end user customers. Sciton liability arising from the sale or shipment, storage, handling or use of the product whether based on alleged negligence or otherwise including liability for breaches of any of the warranties continued in this Section shall not exceed in the aggregate the amount paid by the end user for the goods causing such damage. **NOTWITHSTANDING THE FOREGOING, IN NO EVENT WILL SCITON BE LIABLE TO DISTRIBUTOR OR ANY END USER FOR ANY CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOSS OF USE OR LOSS OF PROFITS) OR FOR ANY DAMAGES SUFFERED BY ANY THIRD PARTY.** Representative hereby warrants that it has informed end users in writing that Representative has no authority to make, extend, modify or alter any warranty given by Sciton to its end user customers. Representative agrees that it, its employees, representatives and agents shall make no representations to Sciton customers concerning warranties with respect to the products covered hereby, except as expressly authorized by Sciton in writing. Representative hereby indemnifies Sciton from actions for and including Sciton's reasonable attorneys' fees in defending such claims arising in whole or in part out of Representative breach of the foregoing provision.

**EXHIBIT D**

**WIN/LOSS REPORTS**

Format is not important, the message is.

## EXHIBIT E

**STANDARD TERMS AND CONDITIONS** – The following standard terms and conditions of sale apply except as specifically modified in the agreement above. For the purposes of this Exhibit, all references to Buyer shall be deemed to be referencing the Representative.

1.  **LIMITS OF AGREEMENT**

The terms and conditions as set forth herein as well as any additional terms and conditions that may appear on the face hereof shall constitute the entire agreement between Sciton, Inc. ("Seller") and Buyer. Seller will not be bound by any terms of Buyer's order that are inconsistent with the terms herein. Acceptance of Buyer of these terms may be made either (a) by written acceptance, or (b) by receipt by Buyer of delivery of any products described on the face of this Form ("**Products**") failure by Buyer to return the Products within five (5) days following such delivery. The Agreement shall not be modified except in writing, signed by the parties hereto. No waiver by Seller of any default of provision hereof shall be deemed a waiver of any subsequent default or provision.

2.  **PRODUCTS PROVIDED AND PRICE**

   (a)   Unless otherwise provided on the front of this form, products furnished hereunder shall be newly manufactured and products but may contain components which have been previously used in other product units. Such previously used components have been disassembled, reprocessed and reassembled, as appropriate, and meet or exceed the Seller's specifications for newly manufactured components.

   (b)   The price of all Products unless otherwise specifically stated on the face hereof is F.O.B. carrier, at the place of manufacture or warehouse location, which is the address set forth on the face hereof, exclusive of insurance cost. The cost of packaging for normal domestic shipment is included in the invoiced price. Where special domestic or export packaging is specified, involving greater expense, a charge will be made to cover such extra expense.

   (c)   Prices and orders do not include Federal, State of local excise, sales, use or local excise, sales, use or other taxes now or hereinafter enacted, which are applicable to the Products sold hereunder or this transaction (excluding only taxes based on Seller's income), which tax or taxes will be added by Seller to and paid by Buyer the sales price when Seller has the legal obligation to collect the same and will be invoiced to and paid by Buyer, unless Buyer provides Seller with a proper tax exemption certificate. In the event Seller is required to pay any such tax, fee or charge at the time of sale or thereafter, the Buyer shall reimburse Seller therefore.

   (d)   Prices quoted are for the Products and services described on the face hereof only and do not include technical data, proprietary rights of any kind, patent rights, qualification, environmental or other than Seller's standard tests unless expressly agreed to in writing by Seller.

   (e)   Unless otherwise stated by /seller in writing, all quotations are firm for, and expire, thirty (30) days after date thereof and constitute offers.

3.  **PAYMENT TERMS**

   (a)   Full payment of Representative's Purchase Price for the Products and spare parts sold to end users (including any freight, taxes or other applicable costs initially paid by Sciton but to be borne by Representative) shall be made by Representative to Sciton on terms substantially similar to those Sciton provides to its direct customers. This means, orders



will be booked upon receipt of a PO and a $10,000 deposit. Balance of payment is due upon installation if privately financed, or is due promptly upon funding by a third party leasing company. In no case shall the terms extend longer than net 15 days from time of shipment except in the extraordinary case that a unit is found substantially not to function at time of installation. These cases will be handled on a case by case basis by discussion and negotiation between Representative and Sciton. In such a case where additional delays in payment are incurred as a result of a Sciton failure to perform, Representative should obtain agreement from Sciton prior to extending terms beyond net 15 days. Agreement to a reasonable extension will not be unreasonably withheld.. Payment terms for a limited number of demonstration units to be held in Representatives inventory will be extended by prior negotiation and agreement. Payment shall be in U.S. dollars and shall be effected by means of an irrevocable and confirmed letter of credit drawn on a California bank approved by Sciton or by wire transfer; the letter of credit shall be upon terms acceptable to Sciton, shall allow for partial shipments, and shall be in an amount equal to Representative's Purchase Price for the Products plus all applicable taxes, shipping charges, and other charges to be borne by Representative. All exchange, interest, banking, collection, and other charges shall be at Representative's expense. At such time as Sciton may grant a line of credit to Representative, payment terms shall be net thirty (30) days, and payment shall be made by wire transfer, check or other instrument approved by Sciton. Payment due to Sciton is not contingent upon Representative receiving payment from end user first. Any invoiced amount not paid when due shall be subject to a service charge of one and one-half percent (1.5%) per month. Representative shall pay all of Sciton's costs and expenses (including reasonable attorneys' fees) to enforce and preserve Sciton's rights under these payment conditions. Payment shall not be withheld for delay in installation if at Buyer's request nor for delay in delivery or required documentation unless a separate price is stated therefore, and only to the extent of the prices stated.

(b)     All orders are subject to, and the obligation of Seller to make deliveries is subject to, the right of the Seller as provided in paragraph 11, to require of the Buyer payment of all or any part of the purchase price in advance of delivery or to make shipment C.O.D. If the Buyer fails to make advance payment when requested by Seller, or if the Buyer becomes delinquent in the payment of any sum due Seller (whether or not arising out of this order) or refuses to accept C.O.D. shipment, then Seller shall have the right, in addition to any other remedy to which it may be entitled in law or equity, to cancel the sales order, refuse to make further deliveries, and declare immediately due and payable all unpaid amounts for goods previously delivered to the Buyer. Partial shipments made under any order shall be treated as a separate transaction and payment thereof shall be made accordingly. However, in the event of any default by Buyer, Seller may decline to make further shipments without in any way affecting its rights under such order.

(c)     Seller reserves a purchase money security interest in the Products sold hereunder and the proceeds thereof, in the amount of the purchase price. In the event of default by Buyer on any of its obligations to Seller. Seller will have the right to repossess the goods sold hereunder without liability to Buyer. In such event, Buyer agrees to make the Products available to Seller so that Seller can repossess them without a breach of the peace. This security interest will be satisfied by payment in full. A copy of the invoice may be filed with appropriate authorities at any time as a financing statement and/or chattel mortgage to perfect Seller's security interest. Buyer shall cooperate fully with Seller to execute such other documents and to accomplish such filings and/or recordings thereof as Seller may deem necessary for the protection of Seller's interests in the Products furnished hereunder.

4.     **TRANSPORTATION AND RISK LOSS**

Unless otherwise agreed to in writing by Seller, all transportation shall be at the expense of Buyer, Seller reserving the right to ship Products freight collect and to select the means of transportation and routing. Unless otherwise advised, Seller may be insure to full value of the Products or declare full value thereof to the transportation company at the time of delivery and all such freight and insurance costs shall be for Buyer's account. Risk of loss or damage shall pass to Buyers upon delivery of the Products to the transportation company at the FOB point, whether or not installation is provided by or under supervision of Seller.

Seller may at its option obtain insurance for its Products covering their delivery to Buyer and Buyer agrees to reimburse Seller for the cost of providing such insurance. If /buyer has not been notified of the existence of insurance coverage and provides it own insurance for such shipment Seller will waive it insurance charge .

Confiscation or destruction of, or damage to Products shall not release, reduce or in any way affect the liability of Buyer therefore. Notwithstanding any defect or nonconformity, or any other matter, such risk of loss shall remain in Buyer until the Products are returned at Buyer's expense to such place as Seller may designate in writing. Buyer, at its expense, shall fully insure Products against all loss or damage until Seller has been paid in full therefore, or the Products have been returned, for whatever reason to Seller.

5.    **SHIPMENT**

Seller will attempt to meet shipment schedules. However, any shipment quotation or forecast on an order acknowledgement is only an estimate of the time required to make shipment and Seller will not assume liability, consequential or otherwise, because of any delay or failure to deliver all or any part of any order for any reason, including its active or passive negligence. Seller reserves the right to allocate inventories and current production in any way it deems desirable.

6.    **INSPECTION AND ACCEPTANCE**

The Buyer shall have the right to inspect the goods upon tender of delivery. Failure of the Buyer to inspect the goods and give written notice to the Seller of any alleged defect or nonconformity within thirty (30) days after tender of delivery shall constitute an irrevocable acceptance by Buyer of the goods delivered to him; provided that goods for which Seller agrees in writing to provide installation by its personnel, shall be deemed accepted by Buyer of the goods delivered to him; upon completion by Seller of its applicable acceptance tests or execution of Seller's acceptance form by Buyer. Notwithstanding the foregoing, use of any such goods by Buyer, its agents, employees or licensees, for any purpose after delivery thereof, shall constitute acceptance of goods by Buyer.

7.    **RETURNS**

The Products may not be returned to Seller without first obtaining Sellers consent. The request for return and credit must be filed with and shall included purchase order number, approximate date shipped and any and all other identifying numbers (such as invoice number, date of invoice, P.O. numbers, etc). Each request for return of Products for credit should state the type and quantity of goods, the part numbers and the reasons for the return. If return authorization is granted, Products shall be returned in a clean, well packaged condition. No credit allowance on defectives will be made and no replacement for defectives will be shipped in any event, unless the alleged defectives are, among other things, established to Seller's satisfaction after suitable testing and inspection by Seller.

8.    **TERMINATIONS**

Any order for a standard Product with a published price accepted by Seller and terminated by Buyer prior to shipment, shall be subject to a termination charge of not less than ten percent (10%) of the order value to cover costs or processing and order handlings; termination thereof within thirty (30) days before shipment shall be subject to a written acceptance by Seller and termination charge of not less than twenty percent (20%) of the order value; thereafter no such order may be terminated except by mutual agreement in writing. No order for nonstandard products or products without a published price may be terminated by



Buyer except by mutual agreement in writing. Terminations by mutual agreement are subject to the following conditions:

(a)     Buyer will pay, at applicable contract prices, for all Products which are completely manufactured and allocable to Buyer at the time of Seller's receipt of notice of termination;

(b)     Buyer will pay all costs, direct and indirect, which may have been incurred by Seller with regard to Products which have not been completely manufactured at the time of Seller's receipt of notice of termination, plus a pro rata portion of the normal profit on the contract;

(c)     Buyer will pay a termination charge on all other Products affected by the termination. Seller's normal accounting practices shall be used to determine costs and other charges. To reduce termination charges, Seller will divert completed parts, material or work-in-progress from terminated contracts to other customers whenever, in the Seller's sole discretion, it is practicable to do so. In the event of a termination, Buyer will have no rights in partially-completed goods.

9.      **LIMITED WARRANTY – LIMITATION OF REMEDIES**

(a)     Except as otherwise specified herein, Seller warrants the Products:

     (i)     To be free from defects in material and workmanship for a period of time and under such conditions as specified in Seller's warranty for the individual Product, or for twelve (12) months from shipment if a warranty for an individual Product is not specified, and

     (ii)    To perform in the manner and under the conditions as specified in Seller's warranty for the individual Product or for twelve (12) months from shipment if a warranty for an individual product is not specified.

(b)     Products and no representative or person is authorized to bind Seller for any obligations or liabilities beyond this warranty in connection with the sale of Seller's goods. This warranty is made to the original purchaser only at the original location and is non-transferable, and may only be modified or amended by a written instrument signed by a duly authorized officer of Seller. Goods or parts which are replaced or repaired under this warranty are warranted only for the remaining unexpired portion of the original warranty period applicable to the specified product.

(c)     These remedies are available only if Seller is notified in writing by Buyer promptly upon discovery of the defect, and in any event within the warranty period for the individual Product. Seller's examination of such goods discloses to Seller's satisfaction that such defects actually exist and the goods have not been (I) repaired, worked on, or altered by persons not authorized by Seller so as, in Seller's sole judgment, to injure the stability, reliability, or proper operation of such goods; (ii) subject to misuse, negligence or accident; or (iii) connected, installed used or adjusted otherwise than in accordance with the instructions furnished by Seller.

(d)     All Products not requiring fixed installation which Buyer considers defective shall be returned to Seller's office as designated on the face hereof transportation costs prepaid and borne by Buyer (unless otherwise provided on the face hereof). The risk of loss of the goods shipped or delivered to Seller's plant for repair or replacement will be borne by Buyer.

(e)     If it is found that any Product has been returned without cause and is still serviceable, Buyer will be notified and the Product returned at Buyer's expense, in addition, a charge for testing and examination may, in Seller's sole discretion, be made on Products so returned.

(f)     THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES (EXCEPT FOR SPECIFIC WRITTEN PRODUCT PERFORMANCE GUARANTEES) WHETHER WRITTEN, ORAL OR IMPLIED, INCLUDING ANY WARRANTY OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND SHALL BE THE BUYER'S SOLE REMEDY AND SELLER'S SOLE LIABILITY ON CONTRACT OR WARRANTY OR OTHERWISE FOR THE PRODUCT.

## 10.   SELLER'S RIGHTS TO SUBCONTRACT

Seller may subcontract any portion of the work on any item subject to this Agreement, but Seller's obligations and rights hereunder shall not thereby be limited or affected.

## 11.   BANKRUPTCY OR INSOLVENCY OF BUYER

If the financial condition of the Buyer at any time is such as to give Seller in its judgment, reasonable grounds for insecurity concerning Buyer's ability to perform its obligations under this agreement, Seller may (a) by notice in writing to Buyer, cancel this agreement, without judicial intervention or declaration of default of Buyer and without prejudice to any right or remedy which may have accrued or may accrue thereafter to Seller, (b) require full or partial payment in advance and suspend any further deliveries (or continuance of the work, to be performed by Seller) until such payment has been received or (c) make shipments C.O.D.

## 12.   PATENT PROTECTION

(a)     Except or set forth in 12 (b) below, Seller will defend Buyer at Seller's own expense, as set forth herein, against any claim, action or damages that the design or manufacture of any standard Product furnished hereunder, constitutes an infringement of any United States or Canadian patents or other industrial property rights. Buyer shall notify Seller promptly in writing of any such claim of infringement and shall give Seller full authority, information and assistance in settling or defending such claim. Seller shall have no liability whatsoever with respect to any claims settled by Buyer without Seller's prior consent. Seller shall not have any liability to the Buyer under any provision of this clause if any patent infringement, or claim thereof is based upon the use of the goods as modified by any person other than the Seller or in combination with equipment or devices not made by Seller or in a manner for which the goods were not designed.

(b)     Unless otherwise specified on the front of this form, the purchase price for the Products includes licensing fees payable to Sciton, Inc. If such fees are included within the purchase price of the Products, Seller makes the following representations: Seller will hold Buyer harmless for any claim that the design or manufacture of the Products furnished hereunder constitutes infringement of U.S. patents Nos. 4,053, 045; 4,704,583; and 4,746, 201. In addition, Seller will hold Buyer harmless for any claim that the use of the product furnished hereunder constitutes, infringement of U.S. Patent No. 4,161,436 except if the Product is used to manufacture or master laser discs, compact discs, laser memories, or similar products on which the Product is used to record sound, visual matter, or data. Seller shall not have any liability to the Buyer for any claim that the use of the Product constitutes patent infringement with respect to the U.S. Patent 4,161,436, to the extent that claim is based upon parts, equipment or devices added to the Product not supplied by the Seller. These rights granted hereunder are limited solely to the patents enumerated herein.



(c)    In case the Products furnished by Seller with respect to any such claim are hold in and of themselves to constitute infringement and their use is enjoined, Seller within a reasonable time, shall, at its option, either (a) secure for Buyer the right to continue using the Products by suspension of the injunction, by procuring for the Buyer a license or by some other means, or (b) at Seller's own expense, replace the Products with non-infringing goods, or (c) remove the enjoined Products and refund the sums paid therefore. The foregoing states the entire liability of Seller with respect to infringement of intellectual property rights by the goods or any part thereof or by their operation. These provisions, however, shall not apply to any equipment, device or parts specified by Buyer but not manufactured by Seller. THE FOREGOING STATES SELLER'S ENTIRE LIABILITY AND OBLIGATION (EXPRESS, STATUTORY, IMPLIED OR OTHERWISE) WITH RESPECT TO INTELLECTUAL PROPERTY INFRINGEMENT OR CLAIMS THEREFORE.

## 13.    PROPRIETARY RIGHTS

The sale of the Products hereunder to Buyer shall in no way be deemed to confer upon Buyer any right, interest or license in any patents or patent applications or design copyrights the Seller may have covering the Products. Seller retains for itself all proprietary rights in and to all designs, engineering details, and other data and materials pertaining to any Products supplied by Seller and to all discoveries, inventions, patents and other proprietary rights arising out of the work done by Seller in connection with the Products or with any and all Products developed by Seller as a result thereof, including the sole right to manufacture any and all such Products. Buyer warrants that it will not divulge, disclose, or in any way distribute or make use of such information, and that it will not manufacture or engage to have manufactured such Products.

## 14.    EQUAL OPPORTUNITY

Sciton, Inc. certifies that it has developed and has on file affirmative action programs as required by the rules and regulations of Executive Order 11246, as amended and 41 C.F.R. Chapter 60-2.2, issued by the Department of Labor. In addition, Sciton, Inc. is in full compliance with section 503 of the Rehabilitation Act of 1973 and section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974.

## 15.    ERRORS

Stenographic and clerical errors are subject to correction.

## 16.    APPLICABLE LAW; JURISDICTION AND VENUE

This agreement will be governed by the laws of the State of California. The California state courts of Santa Clara County, California (or, if there is exclusive federal jurisdiction, the United States District Court for the Northern District of California) will have exclusive jurisdiction and venue over any dispute arising out of this agreement, and Buyer hereby consents to the jurisdiction of such courts.

## 17.    LIMITATION OF LIABILITY

(a)    Seller will not be liable for any loss, damages or penalty resulting from delay in delivery of the Products when such delay is due to causes beyond the reasonable control of Seller, including without limitation, supplier delay, force majeure, act of God, labor unrest, fire, explosion or earthquake. In any such event, the delivery date will be deemed extended for a period equal to the delay.

(b)    SELLER'S LIABILITY UNDER, FOR BREACH OF, OR ARISING OUT OF THIS AGREEMENT AND/OR SALE WILL BE LIMITED TO REPAIR OR REPLACEMENT OF ANY DEFECTIVE PRODUCTS OR A REFUND OF THE



PURCHASE PRICE OF THE PRODUCTS, AT SELLER'S SOLE OPTION. AS SET FORTH IN PARAGRAPH 9 ABOVE, IN NO EVENT WILL SELLER BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTED PRODUCTS BY BUYER, NOR WILL SELLER BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR OTHER DAMAGES (INCLUDING WITHOUT LIMITATION LOSS OF PROFIT) WHETHER OR NOT SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS, HOWEVER CAUSED, WHETHER FOR BREACH OR REPUDIATION OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE OR OTHERWISE. THIS EXCLUSION INCLUDES ANY LIABILITY THAT MAY ARISE OUT OT THIRD-PARTY CLAIMS AGAINST BUYER. THE ESSENTIAL PURPOSE OF THIS PROVISION IS TO LIMIT THE POTENTIAL LIABILITY OF SELLER ARISING OUT OF THIS AGREEMENT AND/OR SALE.

## 18.    SUBSTITUTIONS AND MODIFICATIONS

Seller will have the right to make substitutions and modifications in the specifications of Products sold by Seller, provided that such substitutions or modifications will not materially affect overall Product performance.

## 19.    ATTORNEY'S FEES AND COSTS

Reasonable attorneys' fees and costs will be awarded to the prevailing party in the event of litigation involving the enforcement or interpretation of this agreement.



## EXHIBIT F

Comprehensive List of Products Currently Offered by Representative or Affiliates

[TO BE COMPLETED]

# EXHIBIT 2

*Sciton, Inc. v. Clarion Medical Technologies, Inc.*

Case No. C13-1334 HRL

C505438390

11:45:54    02-27-2012    2/4

Sciton, Inc
925 Commercial St
Palo Alto, CA 94303
UNITED STATES

R M A   O R D E R

Order Number: 17568    Page:  1
Order Date: 02/24/12
Print Date: 02/27/12

Sold-To: 00010123

Clarion Medical
125 Fleming Drive
Cambridge, ON N1T 2B8
CANADA

Ship-To: U010123

Clarion Medical
125 Fleming Dr.
Cambridge, ON N1T 2B8
CANADA

Attention: Jennifer Pruden
Telephone: 800-668-5236

Attention:
Telephone: 800-668-5236

Salesperson(s):

Credit Terms: N10
          Net 10 days
     Resale:
     Remarks: S/N: 11127   C16627   BILLABLE

Purchase Order: P009144
          Ship Via: A. Logistic / Fed Ex
          FOB Point:

***CORE CHARGES WILL BE CREDITED UPON RECEIPT OF DEFECTIVE FILTERS***

| Ln | Item Number | Due Date | Qty Open | Issues UM | Price | Extended Price |
|----|-------------|----------|----------|-----------|-------|----------------|
| 1  | 1500-201-02 | 02/24/12 | 1.0 | EA | 750.00 | 750.00 |
|    | Filter, BBL, 515 nm | | | | | |

************ CONTINUED ************

6505438390

11 46 08    02-27-2012    3 /4

Sciton, Inc
925 Commercial St
Palo Alto, CA 94303
UNITED STATES

R M A   O R D E R

Order Number: 17568    Page:   2
Order Date: 02/24/12
Print Date: 02/27/12

Sold-To: 00010123

Clarion Medical
125 Fleming Drive
Cambridge, ON N1T 2B8
CANADA

Ship-To: U010123

Clarion Medical
125 Fleming Dr.
Cambridge, ON N1T 2B8
CANADA

| Ln | Item Number | Due Date | Qty Open | UM | Issues Price | Extended Price |
|---|---|---|---|---|---|---|
| 2 | 1500-201-03 | 02/24/12 | 1.0 | EA | 750.00 | 750.00 |
|  | Filter, BBL, 560 nm |  |  |  |  |  |
| 3 | 1500-201-04 | 02/24/12 | 1.0 | EA | 750.00 | 750.00 |
|  | Filter, BBL, 590 nm |  |  |  |  |  |
| 4 | 1500-201-05 | 02/24/12 | 1.0 | EA | 750.00 | 750.00 |
|  | Filter, BBL, 640 nm |  |  |  |  |  |
| 9 | 9900-0101 | 02/24/12 | 4.0 | EA | 7,000.00 | 28,000.00 |
|  | BBL Filter Core Charge |  |  |  |  |  |

| Ln | Item Number | Due Date | Qty Open | UM | Receipts Price | Extended Price |
|---|---|---|---|---|---|---|
| 5 | 1500-201-02 | 02/24/12 | 1.0 | EA | 7,000.00 | 7,000.00 |
|  | Filter, BBL, 515 nm |  |  |  |  |  |
| 6 | 1500-201-03 | 02/24/12 | 1.0 | EA | 7,000.00 | 7,000.00 |
|  | Filter, BBL, 560 nm |  |  |  |  |  |

*********** CONTINUED ************

0505438390                                          11:46:23    02-27-2012              4 /4

```
Sciton, Inc                                    R M A   O R D E R
925 Commercial St
Palo Alto, CA 94303                Order Number: 17568      Page:  3
UNITED STATES                        Order Date: 02/24/12
                                     Print Date: 02/27/12


    Sold-To: 00010123              Ship-To: U010123

    Clarion Medical                 Clarion Medical
    125 Fleming Drive               125 Fleming Dr.
    Cambridge, ON N1T 2B8           Cambridge, ON N1T 2B8
    CANADA                          CANADA
```

```
                                      Receipts
 Ln Item Number        Due Date   Qty Open  UM      Price  Extended Price
 --- ------------------ --------- ----------- -- ----------------- ----------------
  7 1500-201-04        02/24/12      1.0 EA     7,000.00        7,000.00
    Filter, BBL, 590 nm
  8 1500-201-05        02/24/12      1.0 EA     7,000.00        7,000.00
    Filter, BBL, 640 nm
```

```
--------------------------------------------------------------------------
Non-Taxable: 3,000.00   Currency: USD    Line Total:        3,000.00
   Taxable: 0.00                 0.00%   Discount:              0.00
  Tax Date: 02/24/12               Freight   FN :              0.00
 Containers: 0.00                            :                 0.00
Line Charges: 0.00                           :                 0.00
                                    Total Tax:                0.00
                                        Total:           3,000.00
```

# EXHIBIT 3

*Sciton, Inc. v. Clarion Medical Technologies, Inc.*

Case No. C13-1334 HRL

# Meeting Summary – February 22, 2012

1. Announcement of Change
   a. Press Release – Monday February 27th, 2012
   b. Clarion to forward revised customer list including phone numbers and email address. To be sent to Sciton by end of business on Friday February 24th.

2. Forecast of potential system sales anticipated by May 9th, 2012
   a. Clarion will forward sales forecast to Sciton by close of business on Friday February 24th, 2012

3. BBL Training
   a. Clarion will continue to hold trainings as scheduled
   b. Robert Ruck reviewing his schedule and will potentially attend

4. Service Contract Details
   a. Clarion will send specifics and pricing details of each of the different service levels (Gold, Silver, Bronze). This will be forwarded to Sciton on Thursday February 23
   b. Clarion will send list outlining which customers are currently part of which level and whether they are paying monthly, quarterly or annually. This will be forwarded to Sciton on Thursday February 23rd
   c. Clarion will forward document indicating their labour rates and other charges for time and material service work done for non-service contract customers. This will be forwarded to Sciton on Thursday February 23rd

5. Service going forward
   a. John and Jay will be speaking directly on Thursday February 23rd or the morning of February 24th
   b. Customers currently on service contracts with Clarion
      i. Clarion will continue to support systems on existing service contracts until May 9, 2013.
         1. Service on systems that expire prior to May 9, 2012 will transfer to Sciton on date of contract expiration
         2. Service contracts with dates that extend beyond May 9, 2013 will transfer as of May 9th 2013 with compensation for the transfer to be negotiated
   c. Existing Customers on Time and Material service
      i. Clarion will continue to support these customer until May 9th, 2012 or potentially longer as mutually agreed upon

    d. Systems sold by Clarion by May 9th, 2012 (transition period)
   i. Warranty service if required will be provided by Clarion until May 9th and by Sciton beyond that date. – Compensation for the transfer of service to be negotiated
    e. Warranty service will be performed by Clarion until May 9th 2012, and by Sciton from May 9th 2012, with the compensation for service to be negotiated

6. Demo Systems Currently with customers
    a. Dan Negus to work directly with Samson and Dan W on disposition of demo equipment
    b. Clarion will provide list of demo units including
   i. Type of system
   ii. Configuration
   iii. Physicians name
   iv. Purpose of demo
   v. Duration of demo – starting date, proposed end date, anticipated outcome

7. RMA Inventory
    a. Sue, Jay, and Emma will be speaking on the morning of February 23rd to work through items on a "line by line" basis

8. Sciton Accounts Receivable
    a. Balta (Sciton) working with Jennifer (Clarion) – understanding is that it is in good shape with the exception of a few older outstanding discrepancies